32 C C.P.A. (Patents)

**SCHERING & GLATZ, Inc., v. SHARP & DOHME, Inc.**

Patent Appeal No. 4947.

Court of Customs and Patent Appeals.

Dec. 11, 1944.

Rehearing Denied Feb. 7, 1945.

John M. Leach, of New York City, for appellant.

No appearance for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

O'CONNELL, Associate Judge.

This is an appeal in a trade-mark opposition proceeding from a decision of the Commissioner of Patents, 57 USPQ 281, reversing the decision of the Examiner of Interferences dismissing the opposition to the registration of appellant's mark.

The case was argued and submitted by the appellant only, the appellee prior to the calling of the calendar having filed a written notice with the clerk of the court to the effect that it would file no brief and make no appearance at the hearing, and that it no longer desires to oppose the appeal herein and the application filed by the appellant in the United States Patent Office for the registration of the mark in question.

The action of the appellee in withdrawing its opposition relieves the court of the necessity of determining the rights of the respective parties as between themselves. It does not follow, however, that the appellant is entitled to a judgment reversing the Commissioner of Patents.

Congress has declared, as a matter of public policy, that marks which are deceptively similar to an existing trade-mark shall not be registered if they are for use on merchandise of the same descriptive properties.

The primary purpose of the statutory prohibition is to protect the public against confusion or mistake in the purchase of goods, and the Commissioner of Patents, in refusing to register a prohibited mark, acts as the guardian of the public interests, and not merely as an arbiter of a private dispute between two parties. Century Distilling Co. v. Continental Distilling Corp., D.C., 23 F.Supp. 705.

For this reason it is not only the right but the duty of the tribunals of the Patent Office to determine, ex parte, and without reference to the issues raised by the notice of opposition, whether or not the mark submitted by an applicant is entitled to registration. See Burmel Handkerchief Corporation v. Cluett, Peabody & Co., Inc., 127 F.2d 318, 29 C.C.P.A.(Patents) 1024, and authorities therein cited.

For the same reason a consent or an agreement authorizing the registration of a mark entered into between the applicant for its registration and the owner of an existing trade-mark is of no legal force or effect as the parties by their deeds or agreement cannot confer upon the Commissioner of Patents the power to do that which he is prohibited from doing under the law. See Skookum Packers Ass'n v. Pacific Northwest Canning Co., 45 F.2d 912, 18 C.C.P.A. (Patents) 792, 797; George A. Breon and Company, Inc. v. Abraham Aronovic, 33 USPQ 390; Fruit Industries, Ltd. v. Ph. Schneider Brewing Co., 46 USPQ 487.

The appellant in the case at bar, however, feeling aggrieved by the refusal of the Commissioner of Patents to register its mark, has the right under the statute to a determination by this court of the validity of the adverse decision with which it is confronted.

Since the facts upon which the Commissioner of Patents based his action are fully set forth in the record submitted, and since it appears therefrom that he has represented the public, as was his duty, the court may review the legal questions involved herein and render judgment. Frankfort Distilleries, Inc. v. Dextora Co., 103 F.2d 924, 26 C.C.P.A.(Patents) 1244.

The Commissioner of Patents has held herein that the goods of the respective parties are merchandise of the same descriptive properties, and that applicant's mark "Thromboquin," used since 1940, is deceptively similar to opposer's mark, "Thrombol," registered and used since 1926, and, therefore, the registration of "Thromboquin" as a trade-mark was prohibited under section 5 of the Trade-Mark Act of February 20, 1905, 15 U.S.C.A. § 85.

The pertinent part of section 5, supra, provides:

" * * * That no mark by which the goods of the owner of the mark may be distinguished from other goods of the same

class shall be refused registration as a trade-mark on account of the nature of such mark

\* \* \* \* \* \*

"Provided, That trade-marks which \* \* \* so nearly resemble a registered or known trade-mark owned and in use by another and appropriated to merchandise of the same descriptive properties as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers shall not be registered \* \* \*."

■■ In determining the question of the confusing similarity of trade-marks, the marks must be considered in their entirety, but this doctrine is not inconsistent with the rule that one word or one feature of a mark may be the dominant part thereof and entitled to greater force and effect than other parts of the mark. See California Prune & Apricot Growers Ass'n v. Dobry Flour Mills, Inc., 101 F.2d 838, 26 C.C.P.A. (Patents) 910. Under any circumstances, the common portion of the marks must be considered and cannot be disregarded. See Nepera Chemical Co., Inc. v. Wm. S. Merrell Company, 50 USPQ 470 and 647.

■ We are of the opinion that the term "thrombo" is the dominant part of each of the marks under consideration. Each mark begins with the same seven letters of the alphabet, namely "thrombo." These letters do not of themselves form an independent word of the English language, but are recognized as part of a word, a combining form derived from the Greek language.

This root is used in other and longer words, particularly by the medical profession, ordinarily to indicate relationship to such a term as "thrombus," meaning a coagulum of blood elements or a growth of cells, as tumor cells, formed in the heart, a blood vessel, or a lympathic during life.

To the root "thrombo," the opposer annexed the letter "l" to constitute its trademark "Thrombol." To the root "thrombo," the applicant added the suffix "quin," suggesting the presence of quinone, to constitute its mark "Thromboquin."

It may thus be noted that the applicant has appropriated the opposer's entire trademark with the exception of its last letter.

The record discloses that the applicant, in its answer to the notice of opposition, admitted that its mark and the trade-mark of the opposer are used upon goods of the same descriptive properties. Nevertheless, the appellant assigns and argues, as one of the reasons of appeal herein, that the Commissioner of Patents erred in not permitting the applicant to restrict the description of its goods to indicate that the substance contained in its product differs in character from the substance contained in the product of the opposer.

There is no doubt, however, that the goods of the respective parties must be classified as merchandise of the same descriptive properties.

As pointed out above, the primary purpose of the statute is to protect the public against confusion or mistake in the purchase of goods. To effect this purpose, courts have given a liberal interpretation to the phrase "merchandise of the same descriptive properties," with the result that many identical or similar marks have been refused registration, although the respective articles of merchandise in question were considerably different. See California Packing Corporation v. Tillman & Bendel, Inc., 40 F.2d 108, 17 C.C.P.A.(Patents) 1048; Philadelphia Inquirer Co. v. Coe, 77 U.S.App.D.C. 39, 133 F.2d 385, and cases cited therein.

In this connection, however, the appellant further contends that the merchandise in question is sold to an exclusive class of purchasers, namely, doctors, interns, and nurses, and therefore no confusion or mstake in the mind of the public would result in the sale of the goods.

This exclusive class of purchasers, it is asserted, has as part of its technical vocabulary, and readily distinguishes between, medical terms employing the same root, and therefore such class of purchasers would have no difficulty in distinguishing between the two marks "Thrombol" and "Thromboquin," particularly as the goods are of a type that necessitates caution in their use.

This raises the point as to who constitutes the public in the instant case.

■ The statute provides protection for people who have occasion to engage in the purchase of goods. The trade-mark law is made not only for the protection of experts, but also for the public in general—the vast multitude which includes the ignorant, the unthinking, and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions. See Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75.

■ If the merchandise in question is purchased by all classes of people, then all the people constitute the public under the provisions of the statute, but if the merchandise is purchased exclusively by a particular class of people, then that particular class of people constitutes the public under the same statutory provisions.

The agreed statement of facts restricted in scope submitted by the parties to the Patent Office to be used as a basis for its decision contains no direct reference as to the sale of the goods to any class of purchasers, nor to the number of customers who purchase the merchandise. Judging from the exhibits, "Thrombol" is purchased by English and Spanish speaking people, and exported, for example, to the Union of South Africa.

The record shows, however, that "Thrombol" is a natural product composed of finely divided calf brain tissue, while "Thromboquin" is a chemical compound of the quinone group.

"Thrombol" is put up in bottles and is sold in two different forms, depending upon the manner in which it is to be administered; one form is for local application to a bleeding surface by means of gauze or cotton swabs, and the other form is employed for injection into the skin at sites immediately adjacent to the bleeding points. "Thrombol" may also be administered orally.

Those using "Thrombol" are admonished that the remedy should never be given intravenously, because of the danger of causing intravascular clotting.

"Thromboquin" is put up and sold in hermetically sealed sterile ampules and is designed for administration by hypodermic injection into the veins of a patient by or under the supervision of a physician.

By reading the directions for the administration of the two respective forms of "Thrombol," together with the literature accompanying the distribution of the goods, it is fair to assume that the subcutaneous form of the product, at least in the first instance, is to be used only by or under the direction of a physician.

The "Thrombol" literature also states that "before giving diluted Thrombol by oral administration, or before injecting it subcutaneously, patient should be tested for foreign protein sensitivity by intracutaneous injection," and a test therefor is provided which ordinarily would be given by or under the direction of a physician.

Whether such a test is required after it is known by the doctor and the patient that the patient is not sensitive to foreign protein by intracutaneous injection does not appear from the statement of facts.

"Thrombol" is advertised in the opposer's exhibits as being of special value in the case of circumcision. The Patent Office was asked to take judicial notice of the fact that circumcision is often performed by a particular class of ecclesiastical ministers who are members of the general public, and who are not physicians and have never been obliged to take any part of the training necessarily required of one to become a physician.

In support of its contention that members of the general public are to be classified as purchasers of its goods, opposer argued in the proceedings in the Patent Office that a clear and important distinction is to be observed between situations in which remedies are to be administered under the "direction" of a physician and those that are to be administered under his "supervision."

It was pointed out that in case of bleeding following an operation, a doctor or a dentist could telephone a patient directing him as to the use of the medicine, particularly in the case of "Thrombol" for local application. It was further pointed out that there is no reason why a physician could not adequately inform the average hemophiliac how to administer opposer's subcutaneous preparation to himself and thereby avoid the expense and inconvenience of frequently having the physician do so.

It was also stated that judicial notice may be taken of the fact that the average diabetic regularly and daily administers insulin by himself to himself by hypodermic injection without the presence of a physician, after he has once been instructed how to do so.

In reaching a conclusion as to who constitutes the public in the purchase of the goods of the respective parties, it is worthy of note that a doctor's prescription is not required in making a purchase thereof.

■ From the facts in this case and the reasonable inferences that may be drawn from the record, it is clear that while members of the medical profession may predominantly comprise the purchasers of the

products of the opposer, nevertheless the goods are available to purchasers of the general public.

Such a finding, however, is not necessary to a decision herein. The remedy is one likely to be used in an emergency when a matter of seconds may mean the life or death of a rapidly bleeding person. It is common knowledge that doctors, interns, and nurses do not ordinarily go to the drug store in person to purchase a remedy, but frequently order it by telephone or by sending a messenger. This is particularly true in the event of an emergency. Confusion, mistake, or delay in obtaining or applying the remedy may easily result in fatal consequences, and members of the medical profession and their assistants, no matter how discriminating, would have difficulty in keeping in mind and distinguishing between the two marks, "Thrombol" and "Thromboquin."

Considering the goods upon which the marks are used, and considering the resemblance between the marks in significance, sound, and in appearance, it is impossible to escape the conclusion that confusion or mistake and deception of purchasers might likely result from the concurrent use of the two marks on the respective goods of the parties. See Nepera Chemical Company, Inc. v. Wm. S. Merrell Co., supra; Campbell Products, Inc. v. John Wyeth & Brother, Inc., Cust. & Pat.App., 143 F.2d 977.

For the reasons stated, the decision of the Commissioner of Patents is affirmed.

Affirmed.