CHESTER H. ROTH, Inc. v. ESQUIRE, Inc.
No. 28, Docket 21650.

United States Court of Appeals
Second Circuit.

Argued Oct. 9, 1950.

Decided Jan. 17, 1951.

12

Mock & Blum and Asher Blum, all of New York City, for Chester H. Roth Co., Inc.

Cravath, Swaine & Moore, New York City (Bruce Bromley, Harold R. Medina, Jr. and Albert Rosenblum, all of New York City, of counsel), for Esquire, Inc.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

These parties disagreed as to the validity and effect of a contract, executed on July 21, 1938, by their immediate predecessors, governing their joint use and protection of a trade-mark. The plaintiff, a New York corporation, brought this suit against the defendant, a Delaware corporation, on January 21, 1947, for a declaratory judgment to establish that it was not bound by the contract; the defendant sought by counterclaim to have the plaintiff enjoined from using the mark at all. Both parties have appealed from the judgment entered.

The plaintiff owns, through succession from its predecessors, the trade-mark "Esquire," registered on May 15, 1923 under the 1905 Act, now 15 U.S.C.A. § 1051 et

seq., and renewed on May 15, 1943, for hosiery, scarfs, neckties, and mufflers. The defendant also owns, through a predecessor, the trade-mark "Esquire," registered under the 1905 Act on June 5, 1934, for a monthly magazine. These parties succeeded to the respective rights of their predecessors under the contract the latter had executed on July 21, 1938, setting forth their agreement as to the use of the trade-mark and providing for their cooperation to prevent others from infringing or from competing unfairly with it. This contract superseded another to like effect which one of the same parties and the predecessor of the other had previously entered into, and was executed to make sure that the new parties would be bound as the old had been. Hereinafter whenever the contract is mentioned, that of July 21, 1938, is meant, and by plaintiff or defendant is meant such party and its predecessor or predecessors, indiscriminately, unless the context otherwise indicates.

The contract was executed in the light of the following facts and circumstances. Nickels & Lauber, a predecessor of plaintiff, was a Pennsylvania corporation which was organized in 1917 and in that year began to manufacture and sell in Philadelphia men's high grade full-fashioned socks. It adopted the trade name "Esquire" for them in 1922 and secured the registered trade-mark, as above noted, the following year. From then until 1938 it advertised these socks nationally in a modest way and built up a fair national distribution of them. The boxes in which the socks were packed and delivered to retailers were never marked with the manufacturer's name. Its name appeared as the manufacturer in its own advertising but retailers to whom the socks were sold advertised them by trade-mark without the manufacturer's name. The advertisements usually displayed a rather unique drawing of a man's head which has been, properly enough, called a "Pickwickian" figure.

The defendant's predecessor, Esquire Publishing Co., began in 1933 to publish a monthly magazine called "Esquire," subtitled "The Magazine for Men," which at first was confined to men's fashions and distributed to men's stores. But it soon was expanded in scope to include matter relating to women's wear and topics of general interest, though from ten to fifteen per cent of it continued to be devoted to men's fashions. It contained a considerable quantity of advertising of which about half was of men's wearing apparel. Its distribution became general and extensive and it acquired a wide and favorable reputation as an authority on men's fashions.

Until late in 1934, the defendant knew nothing about any trade-mark "Esquire" which Nickels & Lauber had. It did nothing about it until the summer of 1935, when the secretary of Nickels & Lauber informed it that the magazine had so built up the name "Esquire" in connection with men's wear that the plaintiff was having difficulty protecting its mark of that name. It was suggested to the defendant that the two cooperate to protect their respective rights in the mark and this led to the execution of the forerunner of the contract in suit.

On July 7, 1938 a New York corporation called Nickels & Lauber, Inc., hereinafter to be called Nickels, which was a wholly owned subsidiary of Mock, Judson, Voehringer Company and organized for such purpose, bought the entire business of the original Nickels & Lauber of Pennsylvania, including its hosiery inventory, machinery, supplies, good-will, and the trade-mark "Esquire." The seller was then dissolved.

It was this change of parties in interest which brought about the execution of the contract in suit two weeks later. That contract set forth the ownership and use of the registered trade-mark "Esquire" by the respective parties and asserted that "numerous persons, firms and corporations" had, since the magazine "Esquire" appeared, adopted the name "Esquire" as a trademark, style mark, or trade name, in connection with various articles and businesses in an attempt to trade upon and profit by the good name and reputation of the magazine. It also asserted that in many instances such persons also infringed the trademark rights of Nickels and were guilty of unfair competition. Further asserting that it was for "the interests of both parties

that the unauthorized and unfair uses of the word 'Esquire' be enjoined," and that they desired to cooperate to that end and "also to define their respective rights in and to the word 'Esquire' as a trade mark," they agreed, as the trial court found, as follows:

"(1) Nickels agrees not to use its trade-mark 'in any manner other than as shown on the labels, * * * to use said trade-mark solely and only in connection with men's hosiery, * * * men's knitted neckwear, men's scarfs and men's mufflers, * * * never to extend the use of its said trade-mark to any other articles or business, and never to use the word "Esquire" as part of its corporate name,' and 'to use its best efforts to prevent any likelihood of confusion between its said products bearing its said trade-mark, and the products or services sold' by the defendant.

"(2) Nickels agrees, upon request of the defendant, to file suits for an injunction,. accounting and damages against any person using the word 'Esquire,' or any word confusingly similar thereto, as a trade-mark in connection with any article of men's wear, or as a name under which to do a men's wear business, and to file Patent Office proceedings to prevent the registration of 'Esquire' for goods of the same class to which Nickels applies its trade-mark, or to cancel any registrations that may have been obtained, and the defendant agrees to pay all the costs of prosecuting such suits or proceedings, including any costs or damages that may be assessed against Nickels, and also including the fee of Nickels' attorneys, provided that the defendant shall have the right to select them.

"(3) Inasmuch as Nickels used the word 'Esquire,' together with the (Pickwickian) illustration, for its products before the defendant began to use the word, the defendant agrees not to interfere with its use by Nickels upon its products in the manner shown by the labels, and Nickels agrees not to interfere with the right of the defendant 'to use the word "Esquire" as its corporate name, to identify itself as an authority in connection with articles of interest to men, as a trade-mark for its magazine, * * * and also in any manner to indicate that it approves, sponsors, vouches for or designs any articles of interest to men, including the articles upon which Nickels uses its said trade-mark.'

"(4) The agreements shall be binding upon the successors and assigns of the parties."

The business of Nickels in selling socks under the trade-mark did not prosper, however, and in a few months, on December 20, 1938, its parent, the Mock Company, sold all of its capital stock to the plaintiff, together with all its assets, consisting of its inventories of merchandise and supplies and its trade-mark "Esquire," which was warranted not to have been abandoned. As part of this transaction the Mock Company, which was a manufacturer of men's full-fashioned hosiery, agreed to sell such hosiery only to the plaintiff until July 1, 1939, and the plaintiff agreed to buy such hosiery only of Mock for that period. About 26,000 pairs of such hosiery were thus sold by Mock and those, as well as what the plaintiff had received from Nickel's inventory, were disposed of under the name "Esquire" by the end of 1940. Thereafter no more full-fashioned hosiery was sold by the plaintiff but it sold "Esquire" seamless hosiery which was for a while made for it by an independent manufacturer. Its receipts from sales of such hosiery were about $165,000 in 1941 and by 1944 had increased to about $2,000,000 and thereafter the annual increase continued. Until November 1946, the plaintiff operated this business at its "Nickels & Lauber Division" but then there was a merger of Nickels with the plaintiff and the entire business, trade-mark and good will of Nickels was duly assigned to the plaintiff.

In 1944 the plaintiff began to manufacture men's socks and has since been both a manufacturer and distributor of them. After it acquired the trade-mark "Esquire" in 1938, it used that mark on its best grades and now uses only that mark on its nationally advertised hosiery. It has never used it on anything but men's hosiery.

As early as September, 1940, the plaintiff and the defendant began to disagree as to their rights under the contract, especially in respect to the way the plaintiff

could advertise "Esquire" hosiery. Their attorneys then conferred and did so again in May, 1942, without resolving their differences. During the war the plaintiff advertised for the most part in trade papers and made allowances to retail purchasers for their advertising of the socks but as to their advertising it merely made suggestions without exercising any supervision. After the merger in November 1946, the Pickwickian figure was dropped from plaintiff's advertising, packaging, and labeling, and plaintiff embarked upon a compaign of extensive advertising of nation-wide scope. Before that, however, and on August 21, 1946, the plaintiff had written the defendant that it considered the contract void and further as follows, "we will no longer operate thereunder or fulfill the same. It is our intention to use our registered trademark 'Esquire,' free from the restrictions of the aforesaid agreement in toto. We shall be pleased to accept service."

To establish its freedom from these restrictions the plaintiff commenced this action. The judgment declared that the contract was valid and binding upon both parties, and that the plaintiff's use of "Esquire" was restricted as a trade-mark and in its advertising to men's hosiery, men's knitted wear, men's scarfs and men's mufflers; it required the plaintiff to indicate in its own advertising of "Esquire" products their source by showing its name as the manufacturer or distributor; and dismissed the counterclaim on the merits.

■ The contract was valid. It set forth the mutual promises and undertakings of the parties which were for each other a good and sufficient consideration. Moers v. Moers, 229 N.Y. 294, 128 N.E. 202, 14 A.L.R. 225. It provided for the joint use and protection of a trade-mark in one word "Esquire," the use of which might otherwise well be confusing. Such agreements have a legitimate business purpose and are not contrary to public policy. California Fruit Growers Exchange v. Windsor Beverages, Ltd., 7 Cir., 118 F.2d 149; California Packing Corporation v. Sun-Maid Growers, 9 Cir., 81 F.2d 674, certiorari denied 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed. 1391; Waukesha Hygeia Mineral Springs Co. v. Hygeia S. D. Water Co., 7 Cir., 63 F. 438.

■ Nor was there any champerty or maintenance since there was no provision for sharing the proceeds of any litigation nor any purpose on the part of either to foment suits which did not seek to protect a legitimate business interest of its own. 6 Williston on Contracts, Sec. 1711; Restatement of Contracts, Sec. 540. Cf. Matter of Gilman's Estate, 251 N.Y. 265, 270–271, 167 N.E. 437, 439–440; Vitaphone Corporation v. Hutchinson Amusement Co., D.C., 28 F.Supp. 526. The agreement is not invalid as a contract to deceive the Patent Office, for, assuming it contained anything relevant to Patent Office proceedings, there is nothing in this record to indicate that the parties contemplated fraudulent concealment.

The defendant's counterclaim alleged its ownership of the registered trade-mark "Esquire" for a magazine, its use of it as such, and the great national and international success of its magazine "Esquire" as a "reliable, disinterested, authentic and up-to-date guide and authority on subjects concerning wearing apparel." The gist of its complaint was that the plaintiff had unfairly competed by acquiring all the Nickels stock "with the sole intent of acquiring colorable rights to the use of the mark Esquire in the wearing apparel field" and by using it in that field, that it had infringed the mark; and that it had broken the agreement, by using the mark "Esquire" as its corporate name and in other ways. It sought, in addition to enjoining all use of the mark as above noted, to enjoin breaches of the contract and an accounting for profits with an award of damages for past breaches.

■ The contention that the plaintiff acquired only a colorable title to the mark was based upon the erroneous notion that when the plaintiff bought the capital stock of Nickels the latter was not in business and that the transaction was but the sale of the trade-mark in gross. Well supported findings of the trial court entirely refute this and show that the plaintiff not only bought the capital stock but also a going business with its assets and its trade-mark.

Thus it acquired a good title to the mark. Kidd v. Johnson, 100 U.S. 617, 25 L.Ed. 769; U. S. Ozone Co. v. U. S. Ozone Co. of America, 7 Cir., 62 F.2d 881. Equally futile is the contention, not borne out by the facts, that the plaintiff used "Esquire" in its corporate name. The failure to use the Pickwickian figure is likewise of no legal significance since it was not a part of the trademark. Nor was its use required by the contract.

 Nevertheless, the counterclaim should not have been dismissed for the relief actually granted the defendant was obtainable under it. It was sufficient as a pleading to put in issue the defendant's right to have the contract interpreted, as it was, to require the plaintiff to "indicate in its own advertising the source of said 'Esquire' products which it sells or otherwise distributes, by showing its name as manufacturer or distributor of the product." The plaintiff had, by its letter of August 21, 1946, repudiated the contract in which the parties, as the trial court found, had recognized the danger of confusion when each was using the same word, one as a mark for certain kinds of men's apparel, and the other as the name of a widely circulated and well-known magazine largely devoted to the display and discussion of men's apparel from the standpoint of style and fashion. And as a part of their agreement they had expressly provided that the plaintiff would use its best efforts to prevent any likelihood of confusion. Requiring the plaintiff to indicate the source of its products when it advertises them is a reasonably appropriate means for enforcement of this agreement. Cf. S. C. Johnson & Son, Inc. v. Johnson, 2 Cir., 175 F.2d 176, certiorari denied 338 U.S. 860, 70 S. Ct. 103; S. C. Johnson & Son, Inc. v. Johnson, 2 Cir., 116 F.2d 427. The judgment is therefore modified to sustain the counterclaim to the extent relief to the defendant has been granted. There was, however, no error either in denying any accounting for profits or an award of damages, neither having been shown to exist. Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969.

Affirmed as modified.