49 CCPA

Application of NATIONAL DISTILLERS AND CHEMICAL CORPORATION, doing business as National Distillers Products Co.

Patent Appeal No. 6706.

United States Court of Customs and Patent Appeals.

Jan. 12, 1962.

942

Breed, Abbott & Morgan, New York City (Gerald J. Craugh, New York City, of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

SMITH, Judge.

The Commissioner of Patents, purporting to act under Rule 7 of this court, 35 U.S.C.A.Appendix, has filed a Petition for Rehearing of the decision of this court which was rendered herein on August 16, 1961.[1] In this petition of some

---

* United States Senior District Judge for the Eastern District of Pennsylania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of

Section 294(d), Title 28 United States Code.

[1.] The earlier opinion was withdrawn from publication.

27 pages we are told that there are 20 "errors manifest" or matters "overlooked or misapprehended" which are explained and argued at great length and in considerable detail.

This petition amounts to a reargument of the case which was more concisely argued in the Commissioner's main brief of but 21 pages. The petition presents nothing new, nothing that was overlooked, and nothing that was not briefed and argued by the parties and fully considered by this court prior to rendering the decision herein. The Commissioner's Petition for Rehearing is therefore denied both on its merits and for failure to comply with the requirement of our Rule 7 that:

"The petition in each case shall be confined to a *brief statement* of points supposed to have been overlooked or misapprehended by the court, with proper references to the particular portion of the transcript of the record or original briefs relied upon, and with authorities and suggestions, *concisely stated*, in support of the points. * * *" (Emphasis added.)

In order, however, to revise certain portions of our prior opinion it is hereby withdrawn and the following opinion is substituted therefor.

This case comes to us on appeal by the applicant from the original decision of the Trademark Trial and Appeal Board of the United States Patent Office rendered April 8, 1960, In re National Distillers & Chemical Corp., 125 USPQ 197, affirming the decision of the Examiner of Trademarks refusing registration of applicant's trademark MERITO for rum,[2] and from a decision on applicant's petition for rehearing or reconsideration rendered May 9, 1960 which, in effect, adheres to the original decision of April 8, 1960.

The board held that the marks MERITO for *rum* and MARQUÉS DEL MÉRITO for *wines*,[3] so resemble each other that confusion or mistake or deception of purchasers would be likely, and affirmed the examiner in rejecting, under section 2(d) of the Lanham Act [15 U.S.C. § 1052(d), 15 U.S.C.A. § 1052(d)], the application for registration of the mark MERITO for *rum*.

The issue before us on this appeal is whether the examiner and the Trademark Trial and Appeal Board properly refused to register the mark MERITO for rum. The board below, in refusing this registration, stated in its decision of May 9, 1960:

"The board remains of the opinion that applicant's mark so resembles the registered trademark as to be likely, when applied to such goods, to cause confusion or mistake of purchasers."

Applicant asserts that there are such differences in the marks and in the goods as would eliminate likelihood of confusion or mistake or deception of purchasers, and in addition asserts its right to use the mark MERITO on rum based on agreements with the owner of the reference mark.

We shall first consider whether the differences in the marks and in the goods are such that confusion or mistake or deception of purchasers is likely. The marks MARQUÉS DEL MÉRITO and MERITO do not look alike, sound alike nor evoke the same psychological responses. Wines and rum are goods whose differences are clearly recognized by the purchasers thereof. These differences are sufficient to raise a doubt as to likelihood of confusion, mistake or deception of purchasers arising from the common use of the word MERITO. Under these circumstances, we think the alleged agreements between applicant and the owner of the reference registration are of evidentiary value.

As was stated in Avon Shoe Co., Inc. v. David Crystal, Inc., 171 F.Supp. 293

---

2. Application Ser. No. 58,363, filed September 4, 1958.

3. Reg. No. 304.257, registered June 27, 1933; renewed June 27, 1953.

(D.C.S.D.N.Y.1959), affirmed 279 F.2d 607:

> "Likelihood of confusion is a relative concept which can be determined only according to the particular circumstances of each case. Mere comparison of the trademarks side by side is not sufficient. The conditions in the market place, not the courtroom, are the controlling factors. Gort Girls Frocks, Inc. v. Princess Pat Lingerie, Inc., D.C.S.D. N.Y.1947, 73 F.Supp. 364."

 It is a fact of which we take judicial notice that in the "market place" the lawful right to use a mark frequently is based on agreements between users of the marks. Such agreements may, as here, constitute a consent by one party to the use of a mark by the other party. The question then arises as to what effect should be given to such consent. As such, it seems to us that here the agreements should have been treated as the written consent was treated in Ex parte Frostmann & Huffmann, 151 Ms.D. 789, 18 TMR 589 (Comm'r, 1928), where First Assistant Commissioner Kinnan, prior to the Lanham Act, stated:

> "This consent must be construed to mean that in the judgment of the registrant confusion in the trade would be quite unlikely or entirely absent. If the goods were identical registration should notwithstanding this consent of the registrant, be denied the applicant, but since the goods are different to some degree at least and since woolen goods are not generally used for the same purpose as the goods upon which the registrant uses its mark, it is believed, as the registrant has given consent to the applicant's use of the mark upon its particular class of goods, registration should not be denied."

We also agree with Professor Derenberg's statement that:

> " * * * where there may exist reasonable doubt in the examiner's mind because of differences in either the marks or the goods, or both, con-

sent by a prior registrant should, and under recent practice usually will, have an important persuasive effect in determining registrability. In other words, the Patent Office may conclude that if the previous registrant would not consider himself injured by the application [registration], there may be less likelihood that the general public would be confused. Such a liberal attitude toward the acceptance of letters of consent will very often avoid unnecessary contests between two or more parties who honestly believe that simultaneous use of their respective marks never has resulted and probably never will result in likelihood of confusion. * * * " (The Patent Office as Guardian of the Public Interest in Trade-Mark Registration Proceedings, 14 Law and Contemporary Problems 288, 307 (1949), 31 JPOS 647, 676.)

However, before we can consider the legal effect here of the alleged agreements between applicant and the owner of the reference registration, we are faced with a problem as to what "evidence" is before us as to the existence and content of these agreements which support applicant's position. The examiner and the Trademark Trial and Appeal Board acted on the basis of certain alleged facts which were stated by applicant's attorney in responses to the examiner's refusal to grant registration. The Commissioner's main brief here asserts that the allegations of fact thus made by applicant are "unsupported by affidavits or other competent evidence," and are therefore "without evidentiary support."

The position of the Commissioner asserted for the first time by the solicitor in this court, is that the allegations of fact accepted by the examiner and the board are not competent evidence because they are not contained in affidavits but are merely assertions made over the signature of counsel for applicant.

██ While we agree with the solicitor that statements made over the signature of counsel are not evidence of the facts

averred, it seems to us that it is the clear intent of sections 1(c) and 41 of the Lanham Act (15 U.S.C. §§ 1051, 1123, 15 U.S.C.A. §§ 1051, 1123) to vest considerable discretion in the Commissioner in adopting rules which establish the legal effect of signed statements of counsel of the kind which the examiner and the board appear here to have accepted in lieu of evidence.

When counsel for applicant made allegations of fact in signed responses to the Patent Office actions, he certified, under Rule 2.15 of the Trade-Mark Rules of Practice, 15 U.S.C.A.Appendix,[4] that "there is good ground to support" them. While such statements are not "evidence" of the facts stated, it seems to us that the examiner may either accept such statements and act upon them, or demand evidence of the facts so stated and which are relevant to the issue. A large measure of discretion is properly given the examiner in this respect. Where, as here, no objection was made to the statements of counsel and the examiner acted upon them, it seems to us that such statements have in legal effect become the equivalent of competent evidence. On this basis, we accept, for purposes of resolving the present issue, the following statement of fact set forth in the original opinion of the board:

"According to the record in this application, in 1939, National Distillers and Chemical Corporation, applicant herein, became the sole distributor in the United States of wines bearing the mark 'MARQUES DEL MERITO'. On September 8, 1939, in connection with this exclusive distributorship, the registration in question was assigned to applicant. In June, 1941, applicant adopt-

ed and began to use 'MERITO' as a trademark for rum. On November 27, 1946, applicant, in continuance of its distributorship of 'MARQUES DEL MERITO' wines, entered into agreements with companies controlled by the registrant, who supplied the sherry and port wines sold under this mark. Under the terms of these agreements, applicant was appointed sole distributor in the United States, its territories and possessions, of 'MARQUES DEL MERITO' sherry and port wines. In addition, each of the agreements provide [sic] for the supplier to assign to applicant, as sole distributor, all trademarks and labels used upon said goods, together with the good will of the business in connection therewith in applicant's territory, and any registrations thereof for said territory; for applicant to secure registrations of such trademarks and labels in its own name where they have not been obtained; and for such trademarks, labels and registrations as had been assigned to or were secured by applicant with the supplier's consent, to be reassigned to the supplier upon termination of the agreement. The agreements further provide that such reassignment shall not apply to the trademark 'MERITO' used by applicant on rum, the supplier consenting to use and registration by applicant of 'MERITO' for rum and waiving all right, title and interest in and to said trademark for such goods. On November 26, 1958, at registrant's request, applicant reassigned the cited registration to registrant. In this assignment, applicant's right to use 'MERITO' for rum was reaffirmed.

---

4. "*2.15 Signature and certificate of attorney or agent.*
"(a) Every paper filed by an attorney at law or other person representing an applicant or party to a proceeding in the Patent Office must bear the signature of such attorney at law or other person except those papers which are required to be signed by the applicant or party (such as the application itself and veri-

fications required of applicants, registrants or others). The signature of an attorney at law or such other person to a paper filed by him, or the filing of any paper by him, constitutes a certificate that the paper has been read; that its filing is authorized; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay."

Applicant has since ceased to be the sole distributor of 'MARQUES DEL MERITO' sherry wines, although it is still the exclusive distributor of 'MARQUES DEL MERITO' port wines.

"The record further shows that applicant has continuously used 'MERITO' for rum since June, 1941. From June, 1941 to December 31, 1958, applicant sold over a million and a half cases of 'MERITO' rum at a total sales price exceeding forty-three million dollars. During the same period, applicant expended more than a million and a half dollars in advertising and promoting 'MERITO' rum in national publications, newspapers, and the like."

The record here does not contain the actual agreements under which applicant asserts it has the right to use and register MERITO for rum. Appellant's brief summarizes the apparently accepted fact that the agreements provide as follows:

"1. Suppliers [the prior registrant here] admit applicant's *ownership of and right to use and register* the trademark MERITO *for rum,* and waive all right, title and interest in and to said trademark for rum, provided

"(a) that said trademark is used on rum produced in Puerto Rico, the United States or its possessions, or the Philippine Islands; and

"(b) that said rum shall not be exported to, sold or offered for sale in Spain, any Spanish possession, Portugal or any Portuguese possession, or Cuba.

"2. Suppliers agree *never* to export to, sell or offer for sale or permit anyone else to export to, sell or offer for sale in the *continental United States, or its possessions, or the Philippine Islands,* any rum bearing any name consisting wholly or partly of the word 'Merito.' "

The agreements upon which applicant relies to support its right to use and register MERITO for rum are between applicant and the owner of the cited registration. Both must be presumed to be familiar with the trade and the market practices in connection with which the marks are used. The agreements, under which applicant has used MERITO, make this use a concurrent lawful use with the registered mark MARQUÉS DEL MÉRITO for wines which, we think, is not likely to cause confusion or mistake or deception of purchasers. We think, therefore, that the agreements by which the prior registrant consented to applicant's restricted use of MERITO for rum should be accepted as additional evidence of applicant's right to registration of the mark which it has been and is using thereunder.

The intent of the Lanham Act appears to us to be to permit registrations of a mark under all of the foregoing conditions. As stated in Senate Report No. 1333, 79th Cong., 2d Sess. (May 14, 1946), at page 3, U.S.Code Cong.Service 1946, p. 1274, one purpose of the Act was

" * * * to simplify registration and to make it stronger and more liberal, to dispense with mere technical prohibitions and arbitrary provisions * * *."

The Senate Report points out (pages 4, 5, U.S.Code Cong.Service 1946, p. 1276) that the prior trademark statutes "have not kept pace with the commercial development" and that the Lanham Act attempts to "modernize the trade-mark statutes so that they will conform to legitimate present-day business practice." See also, 4 Callman Unfair Competition and Trademarks (2d Ed.) p. 2167, and The New Trademark Manual, Robert, 1947, p. 55–56.

Agreements permitting joint and concurrent use of marks have been recognized as valid by the courts. We consider the following decisions to be more persuasive on this issue than we do the arguments to the contrary advanced on behalf of the Commissioner of Patents.

In Chester H. Roth Co., Inc. v. Esquire, Inc., 186 F.2d 11 (C.A.2d 1951), certiorari denied, 341 U.S. 921, 71 S.Ct. 743,

95 L.Ed. 1354 (1951), the court recognized as valid certain agreements which provided for the joint use and protection as a trademark of the word "Esquire," the common use of which might otherwise be confusing. The court said, "Such agreements have a legitimate business purpose and are not contrary to public policy."

In California Fruit Growers Exchange v. Windsor Beverages, 118 F.2d 149, (C. A.7th 1941) the court considered and held valid an agreement which permitted the joint and concurrent use of the two marks in issue under an agreement by which each party had granted the other the right to employ the mark. The court approved this practice.

■■ Applicant has urged us to apply section 19 of the Trade-Mark Act of 1946 in the present ex parte proceeding and has argued in its brief:

> "Since the agreements of November 27, 1946 expressly admit applicant's right to *use and register* MERITO for rum, they constitute a *legal estoppel,* that is, an *estoppel by contract,* in favor of applicant. In addition, applicant's long and extensive use of MERITO for rum, in reliance upon such argeements, also works an *equitable estoppel* in favor of applicant."

We think the clear intent of Congress was that section 19 be limited to inter partes proceedings, and this for the very sound reason that the equitable principles of laches, estoppel and acquiescence are based on facts and should not be applied either in favor of or against one not a party to the proceeding. An ex parte proceeding arising from the refusal of the Patent Office to register a trade-mark does not become an inter partes proceeding in the sense of section 19 of the Lanham Act (15 U.S.C. § 1069, 15 U.S.C.A. § 1069), as urged by applicant, merely because the applicant and the Patent Office appear many times in opposing roles.

The authorities cited for giving no effect to the agreements between the parties are: Skookum Packers' Ass'n, v. Pacific Northwest Canning Co., 45 F.2d 912, 18 CCPA 792 (1930), In re Laskin Brothers, Inc., 146 F.2d 308, 32 CCPA 820 (1944), and Schering & Glatz, Inc. v. Sharpe & Dohme, Inc., 146 F.2d 1019, 32 CCPA 827 (1944). In these cases it was held that the parties by their deeds or agreement cannot confer upon the Commissioner of Patents the power to do that which the statute forbids. We do not think these pre-Lanham Act cases are controlling here since the Lanham Act liberalized the prior act and gave the Commissioner authority to register marks used concurrently under such circumstances as we have in this case.

We think the provisions of the asserted agreements are important circumstances of this case and should have been considered for their bearing upon the issue of confusion, mistake or deception of purchasers.

■ The 1946 agreements here relied upon by applicant as supporting its asserted right to use and register the mark MERITO for rum contain conditions on this right. If we consider the agreements to be "consents" to use the mark MERITO for rum, they are limited or restricted consents. Section 1(a) (1) of the Lanham Act (15 U.S.C. § 1051, 15 U.S.C.A. § 1051) indicates that such limitations and restrictions should be stated in an application for registration of marks where they are exceptions to applicant's claim of exclusive right to use. The present application for registration is not so limited. Since applicant on the present record does not appear to be entitled to a registration broader than its contractual right to use the mark, the present application to register the mark does not appear to comply with section 1(a) (1) of the Lanham Act.

For the foregoing reasons, we *reverse* the decision of the board and *remand* the case for further proceedings consistent herewith.

Reversed and remanded.

MARTIN, Judge, sat but did not participate in decision.

RICH, Judge (concurring).

The lengthy Petition for Rehearing filed by the Patent Office alleges, quite unjustifiably, that this court failed to "take into account the public interest in the issue of likelihood of confusion." It is said that in the first portion of the Lanham Act's section 2(d), preceding the proviso, and in its forerunner in section 5(b) of the 1905 Act, "likelihood of confusion or mistake or deceit of purchasers *is a test for registration* with respect to prior registrations." [My emphasis.] From that incontrovertible fact the Patent Office draws the following deduction:

"The language in section 2(d) retained from the Act of 1905 *is clearly intended to protect the public against likelihood of confusion * * *.*" [My emphasis.]

And it is stated: that "the Commissioner and the Examiner," in examining applications for registration of trademarks, "act as the guardians of the public interest;" that on this appeal "this Court has the duty to determine whether or not the Patent Office tribunals correctly discharged their duty as guardians of the public interest;" and that "Neither the Patent Office tribunals nor this Court can properly avoid making an independent determination of the issue of likelihood of confusion as it involves the public interest."

I should like to examine this concept that section 2(d) was put into the law by the legislature to protect the "public interest" and that this administrative agency in applying it is functioning as the guardian of that public interest. I should like to discuss *how*, as a practical matter, the public interest is protected within the framework of the Lanham Act. This court is as much concerned with protecting the public as is the Patent Office. The problem, however, is how best to do it.

It seems tolerably clear from the Patent Office brief on its petition that it deems the "public" to be potential purchasers of the wares involved, that its "interest" is to be saved from the hazards of a *caveat emptor* policy, more particularly confusion or deception as to the source or quality of goods through the *use* of the same or similar trademarks, and that this is the interest over which it thinks it is standing guard in administering the law, particularly section 2 (d). With all this I can agree insofar as the trademark act *as a whole* is concerned, but it seems to me that the Patent Office misapprehends its function in enforcing the provisions of the first clause of section 2(d). It is, at times, like a cat watching the wrong rat hole.

I gather from what the Patent Office petition says, and from its acts in the instant case, that its zeal as "guardian of the public interest" is so exercised as to *deny* registration if it feels there is, by its independent determination, *any* likelihood of confusion of any kind as between the mark sought to be registered and the prior registration, without regard to the desires, opinions or agreements of the owner of the prior registration and without taking into account, it seems to me, either the facts of commercial life or the intended operation of the Lanham Act. It seems to do this on the assumption that in so doing it is actually protecting the public from confusion. But is it?

Both reason and history seem to point to the correctness of the proposition that the only role the Patent Office *can* play *in protecting the public from confusion*, through its administration, in part, of the trademark law, is by protecting trademarks. The *refusal* of registration, *except as it is an aspect of protecting existing marks* (or the protection of the freedom of the public to use words and symbols in the public domain), does *not* serve to protect the public from confusion because refusal to register has almost no effect on trademark use, which use always precedes application to register, continues during the prosecution of the application, and usually goes on after registration is finally refused, unless something other than that refusal intervenes to stop such use, I will develop this proposition further.

First, however, let us clear away one possible source of misunderstanding. Confusion is not caused by registrations in the Patent Office.[1] Section 2(d) is not directed to confusion *from registration.* The purchasing public knows no more about trademark *registrations* than a man walking down the street in a strange city knows about legal title to the land and buildings he passes. There may be an occasional sign giving notice of ownership, just as an occasional trademark owner will call attention to the fact that he owns it, but it is the exception. What the public knows is the wares and the marks they bear and, perhaps subconsciously, its relationship to them. It is not concerned with legal titles to and registrations of marks. In speaking of likelihood of confusion, insofar as ex parte cases are concerned section 2(d) is dealing with what is usually, in ex parte prosecution, a hypothetical situation, what *would be* likely, on the assumption the mark sought to be registered is used on the goods named in the application and the reference mark is used on the goods named in the registration, under the presumed market conditions relating to the sale and use of those goods. But hypothetical situations do not confuse the purchasing public. The public is confused only by what is done in the marketplace, by real life activity, use of the mark, its counterfeiting, colorable imitation, copying, and the use of such marks as are likely to be confused with it. The *denial* of a registration has little or no effect on such activity. Its denial affords, therefore, little or no protection to the purchasing public. On the other hand, the *granting* of a registration may protect the public from confusion. A good guardian of the public interest must look at both sides of the coin.

The instant case affords an example. Applicant seeks to register MERITO for rum. The facts assumed to have been proved and accepted in the Patent Office as the basis for decision (so that this case is removed from the category of the hypothetical) show that applicant adopted and started to use MERITO on rum at a time when it was the owner, by assignment, of the reference registration of MARQUÉS DEL MÉRITO for wines. That was in June 1941. Applicant has now sold MERITO rum for over 20 years. In the period 1941–1958, it sold one and a half million cases of MERITO rum for more than forty-three million dollars and spent over a million and a half dollars advertising it. MERITO rum (I judicially notice) is today on the shelves of liquor stores in the Nation's Capital. A few weeks after filing the instant application the reference registration was reassigned to the original registrant so that, under section 2(d), it is now a mark "registered * * * by another." On that registration applicant is rejected, notwithstanding complete approval of use and registration by the registrant, the Patent Office insisting that rejection is necessary to protect the public from confusion.

In this situation what in fact protects the public?

The Patent Office, "carrying out its statutory duty of making its own independent determination," which is actually the subjective opinion of an examiner, concludes that, beyond question, the use of MERITO on rum concurrently with use by another of MARQUÉS DEL MÉRITO on wine is likely to confuse the public. In order to protect the public, as the guardian of its interests, it refuses registration. What happens? Nothing. The sale of MERITO rum continues. If the public is confused—and there is no evidence to show that it is—the presumed confusion is merely that it thinks that the same people put out or sponsor MARQUÉS DEL MÉRITO wines and MERITO rum. (They did once but they don't

---

1. The examiner's letter of September 30, 1959, his final action, says:
 "* * * it is the duty of the Patent Office to protect the public and guard against confusion *through the registra-* *tion of a mark* * * *."* [Emphasis mine.]
 The board, in affirming, made no such statement.

now.) I suspect that the public is indifferent to the situation, as it is when the owner of a product sold under a trademark sells its business to another who continues to sell the same product under the same mark. If there is any "confusion" in this picture, it certainly is not injuring the public. The only possible injury is to the owner of the MARQUÉS DEL MÉRITO mark. The refusal of the registration has not protected the public in any way I can see. The customer who calls for MERITO rum still gets MERITO rum from the original source. He has not been confused, mistaken or deceived as to that. The MERITO mark is serving its proper function.

But suppose, now, that another purveyor of rum starts to sell MERITO rum, or MERIT-O, or NERITO, or MARETO rum. Is the purchasing public then likely to be confused, or mistaken, or deceived? Where have the guardianship activities of the Patent Office left it? The longtime and original vendor of MERITO rum would like to enjoin the competitor from copying or colorably imitating the trademark by which its old customers and those recommended by them have been assured of getting rum from the original source. But it has no registration and enjoys no Lanham Act benefits, notwithstanding its twenty years in the field as the sole source of MERITO rum. It can protect itself, and incidentally protect its customers and the "public" from getting products they do not want, only by whatever means the common law or state statutes provide, but not through any Lanham Act weapons so carefully withheld from it by the Patent Office as guardian of the interests of that "public." There is not even a record in the Patent Office that the original vendor has any right to this mark MERITO and when sued the pirate claims he was without notice of plaintiff's mark, challenges plaintiff's exclusive rights to the mark and compels plaintiff to prove its ownership as well as infringement. The confusion and deception of the public continues while the litigation drags on, the infringing stocks are disposed of, and the infringer becomes judgment-proof, awaiting the next chance to strike and take another free ride on MERITO's reputation and advertising expenditures.

On the other hand, if the original purveyors of MERITO rum had a Lanham Act principal register registration, as applied for, they would be in a position to crack down promptly on infringers and preliminarily enjoin the sale of spurious MERITO rum, thus *protecting the purchasing public from confusion, mistake and deception.* The very existence of a registration would tend to inhibit infringement. How else could the Patent Office guard that interest of the public than by affording such protection? Did its denial of registration protect the public? Does anyone expect appellant to stop selling MERITO rum?

I have no doubt that courts of equity would protect, eventually, applicant-appellant in its right to exclude others from using MERITO, or any mark likely to be confused therewith, on rum. If I am right in this, then refusal of the registration produces the anomalous situation of enforceable trademark rights unregistrable under the Lanham Act, one of the situations of the prior law which that act sought to correct. See Alfred Dunhill of London v. Dunhill, 49 CCPA ——, 293 F.2d 685.

I do not believe it is a correct construction of section 2(d) to say that it is intended to prevent the registration of any mark which, in any conceivable way, might confuse some portion of the public and in that way to protect the public. I am of this view for the reason, illustrated above, that the public is not thereby protected.

I believe the primary purpose of section 2(d) is, as an integral part of the act, to protect the owners of prior trademarks. By protecting them, and thus enabling them to protect themselves against infringers, it follows, but as a *secondary* effect, that the public is protected from confusion caused by the sale of spuriously marked goods. No government could police trademark *use* so as to protect the

public from confusion. It must count on the self-interest of trademark owners to do that.

To show that the purpose of section 2(d) is the direct protection of the public, the solicitor quotes the following from Senate Report 1333, 79th Cong., 2d Sess., U.S.Code Cong.Service 1946, p. 1274, which we, of the majority, are charged with not taking into account:

"The purpose underlying *any* trade-mark *statute* is twofold. One is to protect the public so that it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. *This* is the well-established rule of law protecting both the public and the trade-mark owner." [Emphasis mine.]

What could more aptly apply to the *protection* of the applicant's MERITO trademark for rum so as to assure that the public, which favorably knows it, will get it when it asks for it and so that the applicant, who has invested heavily in it will be protected against pirates and cheats? The significance of that passage would seem to depend on whether you italicize "to protect the public," as the solicitor did, and forget the rest or whether you visualize more than one possible way of protecting the public. Moreover, the passage does not refer to section 2(d) at all but to the statute—any trademark statute, in fact—as a whole.

I quote from the next page of the same report:

"This bill * * * has as its object the *protection of trade-marks,* securing *to the owner* the good will of his business and protecting the public *against spurious and falsely marked goods.* The matter has been approached *with the view of protect-*

*ing trade-marks* and making infringement and piracy unprofitable.

\* \* \* \* \* \*

"*To protect trade-marks, therefore, is to protect the public* from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by *preventing their diversion from those who have created them to those who have not.* This is the end to which the bill is directed." [Emphasis mine.]

I believe the court's decision in this case will more effectively carry out these objectives and protect the public than would the decision of the Patent Office denying registration. I do not disagree with the thesis that a major objective of the Lanham Act is to protect the public and that in administering that law the Patent Office acts as a guardian of the public's interests. But I do think there should be a reappraisal of how to go about doing that. I think it would be well to forget some of the generalities uttered in many cases under the Act of 1905 in an earlier time and reconsider what Congress stated, in the Lanham Act itself, are its purposes:

"The intent of this Act is to regulate commerce within the control of Congress *by making actionable the deceptive and misleading use of marks* in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; *to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception* in such commerce *by the use of reproductions, copies, counterfeits, or colorable imitations* of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations." Sec. 45 (15 U.S.C. § 1127, 15 U.S.C.A. § 1127) [Emphasis mine.]

Refusal to register MERITO for rum accomplishes none of these objectives.

Referring to the section 45 statement of intent above quoted, Edward S. Rogers, one of the chief architects of the Lanham Act, said in his introduction to Robert's, The New Trade-Mark Manual (p. xiv):

"Here we have a direct statement of a national policy by the Congress. The purpose of the Act is, in brief, to protect trademarks and to repress unfair competition."

He also said (p. xx):

"The Lanham Act is the embodiment of the purpose to secure to every business man the advantage which public preference for his goods gives to him and to protect him in the exclusive right to the names and marks which perpetuate the good will which merit earns."

And on page xxi:

"The situation has another aspect which should not be overlooked. The public has rights, too. *A purchaser is entitled to receive what he expects to get* and not be misled by *deceptive* resemblance into purchasing something he does not want." [Emphasis mine.]

Twelve years ago, after two years of experience with the administration of the Lanham Act, Professor Walter Derenberg, participating in the program at Duke University called "Trade-Marks in Transition," in his paper entitled "The Patent Office as Guardian of the Public Interest in Trade-Mark Registration Proceedings" (Law and Contemporary Problems, Vol. 14, No. 2, pages 288–322, reprinted 31 J.P.O.S. 647), dealt in great detail with the very problem which the instant case presents. He dealt separately with "public interest" in ex parte and in contested Patent Office proceedings. Speaking of the former, he refers to the "difficult problem of proper evaluation and consideration of the public-interest aspects of * * * third party rights" when "an application for registration comes into possible conflict with prior rights of third parties (Section 2(d))," and of "the problem of balancing public interest and private rights for the purpose of administering Section 2(d)." He said (p. 292):

"* * * it is * * * apparent that the extent to which such public interest should be recognized depends to a very large degree upon the scope of legal protection to which the former owner of the conflicting registration is entitled."

After going into the problem with great care and scholarly consideration of the background law, his final conclusion as to the proper handling of ex parte cases was this (p. 305; 31 J.P.O.S. at p. 674):

"The conclusion would seem to be inescapable, therefore, that even under the broad confusion test of Section 2(d) of the new Act, applications involving possible confusion as to *sponsorship* or *reputation* should not be rejected ex parte on the ground of an ever present parallel interest of the public to be protected from this type of confusion. It seems that for the purpose of registration proceedings *the private interests of the previous registrant are primarily involved* and that *the public interest in such situations is not sufficiently predominant to compel the Office to reject* the application in its capacity as guardian of the public interest and *irrespective of the previous registrant's own attitude.*" [Emphasis mine.]

What we have in the present case is a situation in which the only chance of public "confusion" is as to a possible common *sponsorship* of MERITO rum and MARQUÉS DEL MÉRITO wine. I submit that there is no possibility that purchasers (of either the rum or the wine) will be either mistaken or deceived. The purchaser of either will "receive what he expects to get and not be misled by deceptive resemblance into purchasing

something he does not want," to use Mr. Rogers' words.

It was Derenberg's expert conclusion that in such a situation the Patent Office *is not required by section 2(d)* to reject the application to register, since the interest affected is predominantly private not public, and that consent by the owner of the private interest, the prior registrant, may relieve any concern the Patent Office might have on that score. In the absence of such a consent, the law still affords opportunity for opposition and cancellation wherein private interests can protect themselves, where the public interest is not clearly involved.

It would be trite to say, in this country of government of the people by the people, that *all* law is in the public interest and that every administrative agency in trying to apply the law is acting as a guardian of the public interests. But in speaking of a law enacted *to protect trademark owners*, there is considerable risk of error in pursuing a policy under which the administrative agency deems itself to be guarding the public interest whenever it refuses to register. It properly guards those interests only when such refusal truly furthers those interests. They are not furthered by denying registration to an established, widely-used trademark, even where the use of that mark may cause some confusion in the minds of some members of the public, if that confusion is of such a nature that it does not clearly injure the public and injury to the owner of the prior mark is negatived by his consent. The clause "confusion or mistake or to deceive purchasers" must be construed by a rule of reason to include only such as will injure someone. Otherwise it prevents registration to no purpose.

WORLEY, Chief Judge (dissenting).

In denying appellant's application for registration of "MERITO" the examiner stated:

"Section 2(d) of the 1946 act specifically precludes the registration of a mark which so resembles a mark registered in this Office by another, as to be likely, when applied to the goods, to cause confusion or mistake or to deceive purchasers. It is submitted that such likelihood exists in this case. Applicant's mark 'Merito' so resembles the registered mark 'Marqués Del Mérito' that the contemporaneous use of said mark upon closely related goods (see Ex parte American Wine Co., 90 USPQ 14 and 15; Fruit Industries Ltd. v. Continental Distilling Corp., 25 USPQ 177, and; Dubonnet Wine Corp. v. Ben-Burk Inc. [121 F.2d 508, 28 CCPA 1298] 50 USPQ 76) is likely to cause confusion, mistake or deception of purchasers. *Further, it is of interest to note that the registrant-assignee apparently recognized the likelihood of consumer confusion in certain areas since the assignment specifically bars the instant applicant from exporting to or offering for sale its 'Merito' rum in said areas.*" [Emphasis supplied.]

In affirming, the board added:

"Although the applicant may possess rights as against registrant to use 'MERITO' for rum under the terms of the agreements between them, *it does not necessarily follow therefrom that applicant is entitled to register said mark for such goods.* See: In re Avedis Zildjian Co., 120 USPQ 493 (TT&A Bd., 1959). *Section 2(d) of the Statute prohibits the registration of a mark which so resembles a previously registered mark, as to be likely, when applied to the goods, to cause confusion, mistake or deception of purchasers.* [Emphasis supplied.]

"It seems clear that the resemblances between 'MERITO' and 'MARQUES DEL MERITO' are such that as applied respectively to rum and wine, confusion or mistake of purchasers is quite likely to occur."

I am unable to find any error in the above interpretation of the law or its

application to the facts here and would affirm.

While I agree with the majority that agreements between parties are relevant and entitled to consideration by the courts,[1] my objection to the original majority opinion stemmed from the extraordinary power it seemed to grant individuals to decide for themselves whether confusion of the public would or would not be likely. That responsibility finally rests with the courts and there is nothing in the Lanham Act or any judicial decision which would divest the courts of that obligation.[2]

1. See In re Fleet-Wing Corporation, 188 F.2d 476, 38 CCPA 1039.

2. See Skookum Packers Ass'n v. Pacific Northwest Canning Co., 45 F.2d 912, 18 CCPA 792 (1930), In re Laskin Brothers, Inc., 146 F.2d 308, 32 CCPA 820 (1944), and Schering & Glatz, Inc. v. Sharpe & Dohme, Inc., 146 F.2d 1019, 32 CCPA 827 (1944).