THIS OPINION IS A
PRECEDENT OF THE T.T.A.B.

Mailed:   December 28, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Wacker Neuson SE
_____

Serial No. 79060553
_____

Mollie A. Newcomb of Boyle Fredrickson, S.C. for Wacker
Neuson SE.

Fred Carl III, Trademark Examining Attorney, Law Office 108
(Andrew Lawrence, Managing Attorney).
_____

Before Bucher, Grendel and Kuhlke, Administrative Trademark
Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Wacker Neuson SE has filed an application to register,

on the Principal Register, WACKER NEUSON in standard

characters for goods and services including:

> Work machines for the building industry and for
> the building material industry, namely, skid
> steer loaders, articulated front end wheel
> loaders, all-wheel-steered front end
> loaders...compact excavators, mobile excavators,
> crawler excavators, and parts therefor, namely,
> buckets, blades ..., in International Class 7;
> and

Rental of construction machines, in International Class 37.[1]

Registration has been refused under Section 2(d) of the Trademark Act, 15 U.S.C. §1052(d), on the ground that applicant's mark, when used with its identified goods and services, so resembles the typed mark NEUSON registered on the Supplemental Register for "construction machines, namely, excavators" in International Class 7.[2]

Applicant appealed the final refusal and filed a request for reconsideration. On December 16, 2009, the examining attorney denied the request for reconsideration and the appeal was resumed. On June 2, 2010, the Board denied applicant's request for remand.

The appeal is fully briefed. However, on July 15, 2010, the Board noted that applicant did not provide an explanation for the untimely filing of its reply brief and it stated, in view thereof, that it would not be considered.

---

[1] The application is based upon a request for extension of protection under Trademark Act §66(a), 15 U.S.C. §1141f(a), and International Registration No. 0981255, issued May 28, 2008. This is merely a representative list from the goods in International Class 7. In addition, the application also includes goods in International Classes 9 and 11 that are not subject to a final refusal.

[2] Supplemental Registration No. 1822113, based on Section 44(d), issued on February 15, 1994, renewed.

As a preliminary matter, the examining attorney's objection to evidence attached to applicant's brief as untimely is sustained and this evidence has not been considered. Trademark Rule 2.142(d).

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). However, in this case, we have a third key consideration, namely, a consent to allow applicant to use and register WACKER NEUSON for the identified goods and services, signed by the owner of the cited registration, and an agreement between applicant's predecessor, Wacker Construction Equipment AG, and registrant detailing applicant's rights of use and registration regarding the NEUSON portion of its mark.

There seems to be little dispute that the marks are similar and the goods and services are related. Indeed,

3

applicant's listing of goods in International Class 7 includes "compact excavators, mobile excavators, and crawler excavators" which are legally identical to registrant's "excavators." It is sufficient if likelihood of confusion is established for any item encompassed by the identification of goods in the application. Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986 (CCPA 1981). With regard to applicant's "rental of construction machines," this identification necessarily includes rental of registrant's "excavators." The record supports a finding of relatedness between registrant's goods and applicant's rental services for such goods. Specifically, the record includes several third-party registrations for "excavators" and "rental of construction equipment" under a single mark. In re Albert Trostel & Sons Co., 29 USPQ2d 1783, 1785-86 (TTAB 1993) (third-party registrations probative to the extent they show that the goods and services listed therein are of a kind that may emanate from a single source).

As to the similarity of the marks, we first note the inherent weakness of registrant's mark, in that it resides on the Supplemental Register, presumably because it is a surname. Moreover, applicant's mark has the additional element "WACKER" which appears at the beginning of its

4

mark. However, applicant did not present argument as to this du Pont factor and on this record we consider the marks to be similar.

Applicant characterizes the issues on appeal as (1) whether applicant's mark and registrant's mark refer to the same entity; (2) whether registrant's letter of consent bears substantial weight; and (3) whether the relevant consumers are likely to be confused by the use of WACKER NEUSON.

By way of background, applicant, Wacker Neuson SE, is the resulting company from a merger between Wacker Construction Equipment AG and Neuson Kramer Baumaschinen AG. The NEUSON marks that originated with Neuson Kramer were put in the custody of a private trust, PIN Privatstiftung (PIN).[3] PIN then granted applicant's predecessor, Wacker Construction Equipment AG, an exclusive, irrevocable, and infinite right to use the mark NEUSON in, inter alia, the United States in the mark WACKER NEUSON and consented to applicant's predecessor's use and registration of the mark NEUSON as part of the mark WACKER NEUSON in the United States. As a result of the agreement,

---

[3] While the documents related to these statements were untimely submitted, we consider the statements made by applicant during prosecution of the application and in the brief.

applicant's predecessor filed for and was granted an International Registration for the mark WACKER NEUSON by the International Bureau based on a German registration. Subsequently, as a result of the merger, both the International Registration and the subject application have been amended to reflect applicant as the owner.

In traversing the refusal, applicant submitted two agreements that purport to establish that registrant consents to applicant's use and registration of the mark WACKER NEUSON, and that registrant and applicant constitute a single source. Applicant argues that the:

> WACKER NEUSON mark and the NEUSON mark refer to the same company, i.e., Appellant. The license agreement of record is ... between Wacker Construction (now, after the merger between Equipment AG and Neuson Kramer Baumaschinen AG, known as Wacker Neuson) and a third party, PIN. Every indication of record is that PIN has granted Wacker Neuson an exclusive, irrevocable, and unlimited license to use the NEUSON mark in connection with the name WACKER.

Br. p. 3.

Applicant continues:

> ...even if confusion were to arise, it would be harmless. In the United States, all products formerly sold under the WACKER name originate with Appellant, all products formerly sold under the NEUSON name originate with Appellant, and all products currently sold under the WACKER NEUSON name originate with Appellant.

Id.

6

Applicant also points out that registrant has consented to applicant's use and registration of the WACKER NEUSON mark in the United States. Applicant states that:

> [N]ot only has PIN consented to Wacker Neuson's use and registration of WACKER NEUSON, it actually requires such use by the terms of its agreement, and has also required that Wacker Neuson apply for registration of the mark. Appellant and Registrant are the parties most likely to be damaged in the event confusion might arise, and most able to assess the likelihood of such confusion. And yet Registrant has consented to Appellant's use and registration of the mark. The Examining Attorney must give the PIN letter of consent substantial weight as the uncontroverted evidence in this case.

Br. p. 4.

Finally, applicant asserts that:

> ...the relevant consumers are familiar with the construction equipment industry and major happenings in the industry. The merger of Wacker Construction and Neuson Kramer was significant news ... As a result, the relevant consumer is even less likely to be confused in the face of the mark WACKER NEUSON. If the relevant consumer understands that both WACKER NEUSON and NEUSON refer to the same source, there can be no likelihood of confusion.

Id.

The examining attorney first contends that:

> ... the submitted consent agreement is a "naked consent" and is insufficient to overcome a likelihood of confusion refusal because it neither (1) sets forth reasons why the parties believe there is no likelihood of confusion, nor (2) describes the arrangements undertaken by the parties to avoid confusing the public... [and applicant] was encouraged to submit a more

7

"clothed" consent agreement, indicating the registrant's consent to the use and registration of the mark by applicant. However, applicant has not subsequently provided a more "clothed" consent agreement. For these reasons, the consent agreement is nothing more than a request to register the mark, notwithstanding the likelihood of confusion that may arise between the marks. This makes it a "naked" consent that should not be given the deference that is given to a genuine "clothed" consent.

Br. pp. 9-10.

Next, the examining attorney asserts that the record does not support a finding of "unity of control" such that applicant and registrant could be considered the same source. The examining attorney notes that during prosecution applicant "alleged that it and the owner of the registered mark are both wholly owned subsidiaries of another company [thus] additional evidence is required to show unity of control and that the parties constitute a single source."

With regard to the "license agreement" submitted by applicant, the examining attorney states that:

[T]he agreement never indicates that applicant owns the trademark WACKER NEUSON. While the license provides to applicant an 'infinite right' to use the wording NEUSON together with WACKER as WACKER NEUSON, this right is limited by the terms of the license itself. This is not an ownership right that is granted [and] based on multiple parts of the signed agreement, it is clear that ownership of the trademark has not passed to

8

applicant, but resides with the owner of the cited registration.

Br. p. 12.

Further, he argues that:

[T]he fact that applicant has entered into a license with the owner of the cited registration is an indication that applicant recognizes that its use of its applied-for marks would otherwise be infringing on the rights of another, essentially agreeing that applicant's use of its marks is likely to cause confusion with the trademark owned by the licensor. Here, applicant has entered an agreement with the owner of the registered mark that allows applicant to use the registered mark within its mark. The agreement is necessary because without it this use would infringe the registered mark. Implicit in this license is applicant's admission of likelihood of confusion. Also, in the body of the agreement applicant has explicitly agreed that the trademarks are owned by registrant, not applicant.

Br. p. 13.

We begin our analysis with a brief overview of the guidance provided by the Court of Appeals for the Federal Circuit and its predecessor, the Court of Customs and Patent Appeals, on how much weight should be given to a consent agreement and the perspective on what constitutes a single source.

Thirty years ago, the CCPA addressed the issue of consent agreements and held that:

The history of trademark litigation and the substantial body of law to which it relates demonstrate the businessman's alertness in

9

seeking to enjoin confusion. In so doing, he guards both his pocketbook and the public interest.

Thus when those most familiar with use in the marketplace and most interested in precluding confusion enter agreements designed to avoid it, the scales of evidence are clearly tilted. It is at least difficult to maintain a subjective view that confusion will occur when those directly concerned say it won't. A mere *assumption* that confusion is likely will rarely prevail against uncontroverted evidence from those on the firing line that it is not.

du Pont, 177 USPQ at 568 (emphasis in original).

Later, the Federal Circuit in another consent agreement case involving the marks NARKOMED for anesthesia machines, on the one hand, and NARCO MEDICAL SERVICES for leasing of hospital and surgical equipment and NARCO and design for an apparatus for administration of anesthesia, on the other, reversed the Board's holding that there was a likelihood of confusion. "While we are uninformed as to all the details of the disputes and negotiations, these competitors clearly thought out their commercial interests with care. We think it highly unlikely that they would have deliberately created a situation in which the sources of their respective products would be confused by their customers." In re N.A.D. Inc., 754 F.2d 996, 224 USPQ 969, 970 (Fed. Cir. 1985).

Finally, in In re Four Seasons Hotels Ltd., 987 F.2d

1565, 26 USPQ2d 1071 (Fed. Cir. 1993), the Court, in

reversing the Board's decision affirming a Section 2(d)

refusal, stated the following:

> Not for the first time, the "misguided efforts"
> of the PTO have led the Board to mistakenly "take
> it upon itself to prove facts, quite
> unnecessarily and by reasoning entirely its own,
> to establish a case of likelihood of confusion
> when not asked to do so."  Bongrain Int'l (Am.)
> Corp. v. Delice De France, Inc., 811 F.2d 1479,
> 1485, 1 USPQ2d 1775, 1779 (Fed. Cir. 1987).
> Believing that its role in *enforcing* section 2(d)
> of the Lanham Act is to second-guess the
> conclusions of those most familiar with the
> marketplace, the PTO "is, at times, like a cat
> watching the wrong rat hole."  The role of the
> PTO is not in "deny[ing] registration if it feels
> there is, by its independent determination, any
> likelihood of confusion of any kind as between
> the mark sought to be registered and the prior
> registration, without regard to the desires,
> opinions or agreements of the owner of the prior
> registration. ..."  In re Nat'l Distillers &
> Chem. Corp., 297 F.2d 941, 948, 132 USPQ 271, 277
> (CCPA 1962) (Rich, J., concurring).  Rather, the
> PTO's role is to protect owners of trademarks by
> allowing them to register their marks.  Denial of
> registration does not deny the owner the right to
> use the mark, and thus, will not serve to protect
> the public from confusion.  "No government could
> police trademark use so as to protect the public
> from confusion.  It must count on the self-
> interest of trademark owners to do that."  297
> F.2d at 950-51, 132 USPQ at 279.

See also Bongrain International v. Delice de France, 811

F.2d 1479, 1 USPQ2d 1775, 1778 (Fed. Cir. 1987) ("We have

often said in trademark cases involving agreements

reflecting parties' views on the likelihood of confusion in

11

the marketplace, that they are in a much better position to know the real life situation than bureaucrats or judges and therefore such agreements may, depending on the circumstances, carry great weight ... Here, the board appears effectively to have ignored the views and conduct of the parties").

The examining attorney relies on In re Mastic Inc., 829 F.2d 1114, 4 USPQ2d 1292 (Fed. Cir. 1987). In that case, the Court affirmed the Board's holding that there was a likelihood of confusion despite applicant's submission of a consent agreement. However, in that case, the agreement provided consent only to registration, not *use*, of the mark. Noting that the applicant's application was not based on use in the United States, and the consent referenced the parties' marketing channels as a basis for their conclusion of no likelihood of confusion, the Court stated that if applicant was "making the argument that so long as it makes *no* use in the United States, no confusion will occur, such argument has no validity." Mastic, 4 USPQ2d at 1295. Further, in Mastic, the "consent is conspicuously silent on what are the underlying facts which led the parties to their conclusion of no likelihood of confusion." Id. Unlike Mastic, the record here is not silent as to the arrangements between applicant and

registrant and how that implicates possible confusion.  As

stated in Mastic:

> One must look at all of the surrounding circumstances, as in DuPont, to determine if the consent reflects the reality of no likelihood of confusion in the marketplace, or if the parties struck a bargain that may be beneficial to their own interests, regardless of confusion of the public.  For example, the parties may prefer the simplicity of a consent to the encumbrances of a valid trademark license.  However, if the goods of the parties are likely to be attributed to the same source because of the use of the same or a similar mark, a license (not merely a consent) is necessary to cure the conflict. ... **If the evidence of record establishes facts supporting an applicant's argument that the two uses can exist without confusion of the public, even a "naked" consent to registration is significant additional evidence in support of the applicant's position**.

Id. (emphasis added)

With regard to the issue of single source, where

separate legal entities constitute the same source, a

refusal under Section 2(d) may not stand.  In re Wella

A.G., 5 USPQ2d 1359, 1361 (TTAB 1987), reversed and

remanded on other grounds, In re Wella A.G., 8 USPQ2d 1365

(Fed. Cir. 1988).  However, there must be a "unity of

control over the use of the trademarks."  Id.  In Wella

this "unity of control" was sufficiently evidenced by a

declaration establishing that the applicant, Wella AG,

owned substantially all the outstanding stock of the

registrant, Wella (USA).  However, what establishes "unity

of control" depends on the circumstances in every case. Trademark Manual of Examining Procedure (TMEP) 1201.07(b) (7th ed. rev. 2010).

Finally, in some circumstances, where there is a relationship, but perhaps not the level of "unity of control" envisioned by the Wella doctrine, a consent from the related company may suffice.  As stated in In re Sumitomo Electric Industries, Ltd., 184 USPQ 365, 367 (TTAB 1974):

> While this letter of consent does not constitute an agreement of the type involved in the Du Pont case, this does not mean that it is unacceptable herein.  Each agreement submitted in support of registration must necessarily be judged for its particular value in light of the particular circumstances surrounding the relationship or arrangement between the parties thereto.  In the instant case, the relationship between the parties, both members of the "Sumitomo Group" makes the letter of consent a viable one and one on which we can conclude that confusion is not reasonably likely to occur.  That is, the parties undoubtedly work hand-in-hand to avoid confusion in trade which would be inimical to their best interests, and they are in a position to expeditiously correct any situation that could possibly give rise to confusion in the marketing of their respective goods.

In these hybrid situations, the consent may not be "clothed" in the same manner as would be required from separate entities without any relationship to each other.

With these legal parameters in mind, we review the agreements submitted by applicant and assess their

implications for our du Pont analysis.  The consent

agreement reads in its entirety as set forth below:

> We, the undersigned, PIN PRIVATSTIFTUNG, ... the
> assignees and proprietors of US trademark no.
> 182213 (74/346,259) "NEUSON" (wordmark) hereby
> consent to the use and registration of
> international trademark no. 981255 (US trademark
> application no. 79/060553) "Wacker Neuson"
> (wordmark) in the United States of America (US)
> in the name of Wacker Neuson SE ... in respect of
> all the goods and services, listed therein.

The examining attorney characterized this agreement as

a "naked consent" and did not accord it weight to overcome

the other du Pont factors in the likelihood of confusion

analysis.

Thereafter, upon request for reconsideration,

applicant submitted the license agreement between it and

registrant.[4]  Some pertinent portions are set forth below:

> 1.  On September 23, 2007, LICENSOR
> [registrant] concluded a contract concerning the
> merger of WAG [applicant's predecessor] and
> Neuson Kramer Baumaschinen AG ...
>
> 4.  In the MERGER AGREEMENT, LICENSOR
> undertook to grant LICENSEE [applicant's
> predecessor] the gratuitous, exclusive,
> irrevocable and infinite right to use the
> TRADEMARKS, each in connection with the "Wacker"
> trademark, including use of the TRADEMARKS as a
> company component of the company name "Wacker
> Neuson".  This agreement (hereinafter referred to
> as "LICENSE AGREEMENT") regulates the details of
> the grant of such rights of use to LICENSEE and

---

[4] The rights and obligations of this agreement have passed to
applicant as the legal successor to Wacker Construction Equipment
AG.  Agreement ¶ 9.1.

its obligation to use the TRADEMARKS.  LICENSEE is aware that the "NEUSON" trademark (written in Chinese characters), application No. 5477753, has only been applied for in China, but is not yet registered.

1.1  "TRADEMARKS" are the trademarks listed in Annex 1.1 [the marks are for the word NEUSON by itself and includes the cited registration]

2.1  LICENSOR shall grant LICENSEE an exclusive, gratuitous, irrevocable and infinite right to use the TRADEMARKS (including all other signs and any and all goodwill associated therewith) in the CONTRACT TERRITORY in accordance with this LICENSE AGREEMENT for the products manufactured or distributed by or for LICENSEE and by or for the WACKER NEUSON COMPANIES, in any case, however, only in direct combination with the "Wacker" trademark (i.e. either as "Wacker Neuson" or "Neuson Wacker") and only, if and when not otherwise agreed in Clauses 2.3, 2.6 and 2.7.  The right of use also includes use of the TRADEMARKS as a company component of the company name "Wacker Neuson" and as a domain name by LICENSEE and the WACKER NEUSON COMPANIES.

2.9  LICENSOR already now consents to registration of the "Wacker Neuson" trademark through LICENSEE for the countries and classes of goods licensed in line with Clause 2.1, 2.6 and 2.7.  LICENSEE shall bear the costs for the respective application/registration procedures.

3.3 Licensee is obliged to use the TRADEMARKS in the CONTRACT TERRITORY for the products manufactured or distributed by or for LICENSEE, unless the right of use is vested with LICENSOR in accordance with Clause 2.3.  If LICENSEE does not use the TRADEMARKS in one of the countries of the CONTRACT TERRITORY throughout three (3) years for what reason whatsoever, LICENSEE is obliged to advise LICENSOR thereof without delay.

3.4 Each use of the TRADEMARKS through LICENSEE is deemed a use through LICENSOR.

LICENSEE hereby transfers any and all other signs that may be created in the CONTRACT TERRITORY as a result of the use of the TRADEMARKS to LICENSOR in advance.

4.1 LICENSOR undertakes to maintain the TRADEMARKS in the scope valid at the time of concluding this LICENSE AGREEMENT, unless it conflicts with legal hurdles, in particular third party rights, and take all action required to maintain validity and enforceability of the TRADEMARKS. LICENSOR authorizes LICENSEE already now to defend those TRADEMARKS used in direct connection with the designation "Wacker" against attacks on their existence (e.g. action for cancellation). LICENSEE shall bear the costs of such litigation.

5.1 As between the parties, LICENSEE hereby acknowledges that LICENSOR is the sole owner of the rights in the TRADEMARKS and/or other signs in accordance with Clause 3.4 and any and all goodwill associated therewith, that those are and shall remain the sole and exclusive property of LICENSOR and that LICENSEE does not obtain any right to or title in the TRADEMARKS and/or other signs pursuant to Clause 3.4 based on this LICENSE AGREEMENT, except for the license granted under this LICENSE AGREEMENT.

5.3 Upon termination of this LICENSE AGREEMENT, any and all rights granted to LICENSEE in the TRADEMARKS and/or other signs in line with Clause 3.4 shall expire automatically. LICENSEE shall terminate use of the TRADEMARKS and/or other signs in accordance with Clause 3.4 or of similar trademarks and/or signs upon termination of this LICENSE AGREEMENT. A use-up period of six (6) months from termination of this LICENSE AGREEMENT shall apply for orders traceably already placed at the time when this LICENSE AGREEMENT has been terminated and for use in company names. Any and all rights, goodwill or other claims, including protection of get-up acquired in the TRADEMARKS and/or other signs in accordance with Clause 3.4 shall be deemed LICENSOR'S sole property.

6.1  LICENSEE shall inform LICENSOR immediately in writing of any infringement or challenge of LICENSOR's rights in the TRADEMARKS and/or other signs in accordance with Clause 3.4. In case those TRADEMARKS are infringed that are used in direction [sic] connection with the designation "Wacker", LICENSEE undertakes to initiate and/or conduct any and all actions or proceedings required against violators as soon as LICENSEE becomes aware of third-party infringement of the TRADEMARKS.

The Addendum to the License Agreement includes the following:

2.  LICENSOR hereby grants LICENSEE the right to apply for registration of the "WACKER NEUSON" trademark in the countries stipulated in Annex./A and in the specified form as a trademark for the classes of goods determined in Annex./B. LICENSEE shall bear the costs for the respective registration procedure.

4.  LICENSOR shall at all times remain entitled to apply for registration of the "NEUSON" trademark as a trademark in its own name in the countries listed in Annex./A, to expand it to additional classes of goods (including those specified in Annex./B) and use it.  Should registration of the "NEUSON" trademark or expansion to additional classes of goods not be possible due to LICENSEE's industrial property rights for the "WACKER NEUSON" trademark, LICENSEE shall grant LICENSOR a gratuitous, exclusive, irrevocable and infinite right to use the designation "NEUSON" in the relevant country in accordance with the LICENSE AGREEMENT and undertakes to enforce its own rights against third parties on LICENSOR's request.

This "licensing agreement" grants applicant the "exclusive, gratuitous, irrevocable and infinite right" to use the mark NEUSON within applicant's mark WACKER NEUSON.

Applicant asserts that it is the owner of the WACKER NEUSON mark and the agreement does not directly contradict that statement.  Contrary to the examining attorney's contention, applicant does not, in this agreement acknowledge registrant's ownership of the mark WACKER NEUSON, merely registrant's ownership of the mark NEUSON and *other future* marks that *may be* created as a result of use of the mark NEUSON.[5]  See ¶ 3.4.  What is clear from the record is that registrant maintains ownership of the mark NEUSON by itself. See ¶ 5.1.

While applicant's use of the NEUSON portion of its mark WACKER NEUSON is subject to a "licensing" arrangement with registrant, there is nothing definitive in the agreement that ownership of the combined mark does not reside with applicant.  Further, applicant is obliged under paragraph 3.3 to use the mark NEUSON.  As applicant confirmed in its brief, it manufactures and sells the goods identified in the application also under the NEUSON mark.  Thus, we have before us both a consent to use and register the mark WACKER NEUSON from the registrant and evidence

---

[5] In any event, in circumstances where the applicant imports or distributes goods for the owner of a mark, registration is allowed where the applicant submits "written consent from the owner of the mark to registration in the applicant's name."  TMEP § 1201.06(a).  In this case, the foreign owner of the NEUSON registration has consented to its exclusive licensee's registration of the mark.

that the goods and services with the respective marks
WACKER NEUSON and NEUSON are manufactured and sold by
applicant.

In applying the case law, the examining attorney
argues that the circumstances presented do not fit in
either the consent pile or the single source pile and in
fact are contradictory. However, we find that combined
these agreements are sufficient to outweigh the other du
Pont factors. First, registrant clearly consents to
applicant's use and registration of the mark WACKER NEUSON.
See Consent Agreement. Second, the record makes clear that
the parties are related and the goods and services are
provided by applicant. See, e.g., License Agreement ¶¶ 1
and 4 wherein registrant is implicated as a party involved
in the merger agreement; and ¶ 3.3 which obligates
applicant to use the mark NEUSON. Thus, applicant's
statement that all goods and services provided under the
marks NEUSON and WACKER NEUSON come from applicant, is
supported by the record. Moreover, the license agreement
acknowledges applicant's right to use and register the mark
WACKER NEUSON in the United States. See Agreement ¶ 2.9;
Addendum ¶ 2. Finally, Addendum paragraph 4 recognizes
applicant's property rights in the WACKER NEUSON trademark,
inasmuch as it provides that applicant grants registrant a

right to use the NEUSON mark in the event that applicant's "industrial property rights in the WACKER NEUSON trademark" otherwise prevent such use.

As noted by the Court in Mastic, depending on the surrounding circumstances "even a 'naked' consent to registration is significant additional evidence in support of the applicant's position."  Mastic, 4 USPQ2d at 1295. We find the circumstances here to be more in the category of Sumitomo where the fact that the applicant and registrant were members of an overarching group made an otherwise thin consent agreement a viable one.  Thus, based on the "particular circumstances surrounding the relationship [and] arrangements between the parties" here we can conclude that "confusion is not reasonably likely to occur."

When we view the agreements of record on balance with the other factors, we cannot say that these other factors dictate that there is a likelihood of confusion. Therefore, we conclude that there is no likelihood of confusion.

Finally, to the extent that we have any doubts on this matter, registrant's consent to applicant's registration of its mark WACKER NEUSON negates the presumption that doubts about likelihood of confusion are to be resolved in favor

21

of the registrant.  In re Donnay International Societe Anonyme, 31 USPQ2d 1953, 1956 (TTAB 1994) (by giving consent to the registration of applicant's mark, registrant has removed the basis for applying the equitable concept of resolving doubt in favor of the registrant).

**Decision**:  The refusal to register under Section 2(d) of the Trademark Act is reversed.