THIS OPINION IS A
PRECEDENT OF THE
TTAB

Mailed: February 25, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Bay State Brewing Company, Inc.*

————

Serial No. 85826258

————

William E. O'Brien, Esq. for Bay State Brewing Company, Inc.

Paul Fahrenkopf, Trademark Examining Attorney, Law Office 101,
    Ronald R. Sussman, Managing Attorney.

————

Before Quinn, Bergsman and Goodman,
    Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Bay State Brewing Company, Inc. ("Applicant") seeks registration on the

Principal Register of the mark TIME TRAVELER BLONDE (in standard

characters, BLONDE disclaimed) for "beer" in International Class 32.[1]

The Trademark Examining Attorney refused registration under Section 2(d) of

the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark, when

used for Applicant's goods, so resembles the previously registered mark TIME

---

[1] Application Serial No. 85826258, filed January 17, 2013, originally under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a). Applicant amended the basis of the application to Section 1(b), 15 U.S.C. § 1051(b), alleging a *bona fide* intention to use the mark in commerce.

TRAVELER, also in standard characters, for "beer, ale and lager" in International Class 32,[2] as to be likely to cause confusion.

When the Examining Attorney made the refusal final, Applicant appealed. Applicant and the Examining Attorney filed briefs.

Applicant concedes that there is a likelihood of confusion between its mark and Registrant's, and more specifically that "the marks are similar and the goods related." (Brief, p. 2-3; 4 TTABVUE 3-4). Nonetheless, Applicant asserts that it has a consent agreement with Registrant, and asserts that "the parties acknowledge that confusion is likely _unless_ they both adhere to the terms of the [agreement]." (emphasis in original) (Brief, p. 5; 4 TTABVUE 6). Thus, we must consider the impact of the proffered consent agreement between Applicant and Registrant in the likelihood of confusion analysis.

Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). The existence of a consent agreement relates to one of the *du Pont* factors, namely the market interface between Applicant and Registrant. In order to properly weigh its importance in the context of a full *du Pont* analysis, we will first address the other relevant factors.

We initially consider the second *du Pont* factor regarding the similarity/dissimilarity between Applicant's goods and Registrant's goods. The goods are identical insofar as the identifications in the application and in the cited

[2] Registration No. 4378877, issued August 6, 2013.

2

registration both include "beer." The remaining goods in the cited registration, "ale" and "lager," are otherwise closely related to, and in fact are types of beer.[3]

Insofar as the trade channels and purchasers are concerned (the third *du Pont* factor), because the goods identified in the application and the cited registration are at least in-part identical, we must presume that the channels of trade and classes of purchasers are the same. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (even though there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion); *In re Yawata Iron & Steel Co.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968) (where there are legally identical goods, the channels of trade and classes of purchasers are considered to be the same); *American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute*, 101 USPQ2d 1022, 1028 (TTAB 2011). Such trade channels include liquor stores, beer sections of grocery and convenience stores, and the like, as well as bars and restaurants, and the customers would include ordinary consumers.

---

[3] The record includes evidence that ale is a beer made by warm fermentation. (Wikipedia entry for "Pale Ale," Office action dated March 22, 2013). The Board will consider evidence taken from Wikipedia, bearing in mind the limitations inherent in this reference work, so long as the non-offering party has an opportunity to rebut that evidence by submitting other evidence that may call its accuracy into question. *See In re Swatch Grp. Mgmt. Servs. AG*, 110 USPQ2d 1751, 1754 n.4 (TTAB 2014); *In re Carrier Consulting Group*, 84 USPQ2d 1028, 1032 (TTAB 2007). *See also* TBMP § 1208.03 (2015). In the present case, Applicant had ample opportunity to rebut this evidence (as well as other Wikipedia information), but did not.

The identity in the goods and trade channels therefor, and the overlap in purchasers, are factors that weigh heavily in favor of a finding of likelihood of confusion.

Further, in the absence of any evidence to the contrary in this case, we take judicial notice that beer is often relatively inexpensive, subject to impulse purchase, and often ordered orally in a bar or restaurant.[4] "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000); *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 223 USPQ 1281, 1282 (Fed. Cir. 1984). Thus, the *du Pont* factor of the conditions of sale also weighs in favor of a finding of a likelihood of confusion.

With respect to the first *du Pont* factor regarding the similarity between the marks, we must compare them in their entireties as to appearance, sound, connotation and commercial impression to determine the similarity or dissimilarity between them. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005), quoting *In re E. I. du Pont de Nemours & Co.*, 177 USPQ at 567. "The proper test is not a side-by-side

---

[4] Because the respective identifications include "beer" without any limit regarding a particular price point, we must treat the goods as including inexpensive as well as more costly beers, and therefore presume that purchasers for "beer" include ordinary consumers who may buy inexpensive beer on impulse. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1163-64 (Fed. Cir. 2014) (recognizing Board precedent requiring consideration of the "least sophisticated consumer in the class"). *See also In re Sailerbrau Franz Sailer,* 23 USPQ2d 1719, 1720 (TTAB 1992) (finding that all purchasers of wine may not be discriminating because while some may have preferred brands, "there are just as likely to be purchasers who delight in trying new taste treats.").

comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (citation omitted). The appropriate emphasis is on the recollection of the average customer, who normally retains a general rather than a specific impression of trademarks or service marks. *Spoons Restaurants, Inc. v. Morrison, Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991) (citations omitted), *aff'd.*, No. 92-1086 (Fed. Cir. June 5, 1992). *See Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981); *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1740 (TTAB 2014). As previously stated, the average purchasers include ordinary consumers who drink beer.

In comparing the marks, we are mindful that where, as here, the goods are identical, the degree of similarity between the marks necessary to find likelihood of confusion need not be as great as where there is a recognizable disparity between the goods. *Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1721; *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992); *Jansen Enters. Inc. v. Rind*, 85 USPQ2d 1104, 1108 (TTAB 2007); *Schering-Plough HealthCare Products Inc. v. Ing-Jing Huang*, 84 USPQ2d 1323, 1325 (TTAB 2007).

Although marks must be considered in their entireties, it is settled that one feature of a mark may be more significant than another, and it is not improper to

give more weight to this dominant feature in determining the commercial impression created by the mark. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable.").

In view of the highly descriptive or generic nature of the disclaimed term BLONDE for a type of beer, this portion of the mark has very little or no source-indicating function.[5] *See, e.g., In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997) ("DELTA," not the disclaimed generic term "CAFE," is the dominant portion of the mark THE DELTA CAFE).

In fact, the commercial impression engendered by Applicant's mark is merely that it is the "Blonde" brew of TIME TRAVELER brand beers. That is to say, when Applicant's and Registrant's marks are considered in their entireties, the term BLONDE does very little or nothing to distinguish them. In saying this, we also keep in mind the penchant of consumers to shorten marks. *See In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215, 219 (CCPA 1978) (Rich, J., concurring: "the users of language have a universal habit of shortening full names — from haste or laziness or just economy of words"). *See also Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1819 (TTAB 2015) ("While Opposer's

---

[5] The record includes evidence showing beers that are very pale in color are described as "blonde" and that "[b]londes tend to be clear, crisp, and dry, with low-to-medium bitterness and aroma from hops, and some sweetness from malt." (Wikipedia entry for "Pale Ale," Office action dated March 22, 2013).

beer was originally sold under the BUDWEISER brand, customers soon began to abbreviate the mark, calling for BUDWEISER beer just by the name 'BUD.'"); *In re SL&E Training Stable Inc.,* 88 USPQ2d 1216, 1219 (TTAB 2008). Thus, it is reasonable that such a practice would lead many consumers to drop the highly descriptive/generic term "Blonde" when calling for Applicant's goods. Moreover, this practice takes on added significance in the context of the goods herein. Beer is often ordered by name, in a bar or restaurant, or from a menu, where only the name of the beer will be used (in this case, TIME TRAVELER). Many consumers ordering these goods from a bartender or waiter/waitress will not have the opportunity to see a label when they order the product. Further, if the beer is served in a glass because it is a draft beer from a keg, the consumer may never see a label.

Accordingly, we find that the marks TIME TRAVELER and TIME TRAVELER BLONDE, when considered in their entireties (including the term BLONDE in Applicant's mark), are virtually identical in sound, must be presumed to be virtually identical in appearance insofar as they both are standard character marks, and would be even closer in meaning and overall commercial impression given the arbitrary nature of TIME TRAVELER as used for the identical goods. In regard to the latter, there is nothing about the nature of the respective products that would suggest TIME TRAVELER would have a different meaning, or create a different commercial impression, when used on Applicant's goods, as compared to Registrant's goods. This virtual identity between the marks is a *du Pont* factor that also weighs heavily in favor of a finding of a likelihood of confusion.

7

Absent other *du Pont* factors, the virtual identity in the marks, and the identity in the goods, trade channels, and purchasers, along with the impulse nature of purchases of beer, presents a compelling case for finding a likelihood of confusion. Here, however, there is a consent agreement between Applicant and Registrant, and so we turn to its impact on our balancing of the likelihood of confusion factors.

The record includes copies of a "Long Form Agreement" and a "Short Form Agreement." Both were executed simultaneously. The Short Form Agreement "was intended to be made of public record with the Patent and Trademark Office." (Brief, p. 4; 4 TTABVUE 5). When the Examining Attorney was not persuaded by the Short Form Agreement, Applicant submitted the Long Form Agreement which, according to Applicant, "was intended solely for the internal use of the parties." *Id.* [6] To state the obvious, the Long Form Agreement is a lengthier, more detailed agreement, and it is appropriate that Applicant and the Examining Attorney have focused their attention on this agreement. We will do the same. The essence of Applicant's argument is as follows:

> [B]ecause the Long Form Agreement is detailed, explicit
> and extensive, as long as both parties adhere to the terms

---

[6] Despite what Applicant characterizes as the parties' intentions, the Long Form Agreement was in fact submitted during examination and, therefore, Applicant presumably was aware that by doing so it made this agreement part of the public record. *See* Trademark Rule 2.27(d)-(e); TMEP § 109 (2015). Unlike confidential documents in the Board's *inter partes* trial proceedings, papers filed in *ex parte* examination and subsequent appeal proceedings cannot be filed under seal pursuant to a protective order unless so issued or ordered by any court or by the Board. *See Holmes Oil Co. v. Myers Cruizers of Mena Inc.*, 101 USPQ2d 1148, 1150 n.4 (TTAB 2011). We further point out that, in the context of a consent agreement that an applicant identifies as part of the basis to overcome a Section 2(d) refusal, the full text of the parties' agreement takes on additional significance, in that it not only is offered in support of registration but provides the public notice of the basis on which the USPTO allowed registration.

> of the Long Form Agreement and use the terms as provided in that Agreement, confusion is extremely unlikely. The Patent and Trademark Office has not shown "good reason" to substitute its views on likelihood of confusion with those of the parties.
> (Brief, pp. 2-3; 4 TTABVUE 3-4)

*****

> In this case, Applicant and [Registrant] made "reasoned assessments of the marketplace" in a detailed agreement that is the Long Form Agreement submitted on December 30, 2013. This Agreement … is a non-naked, well-reasoned and detailed agreement drafted by knowledgeable parties intimately familiar with the market and eager to avoid confusion. As is shown below the parties crafted an agreement designed to avoid confusion in the marketplace and underscored the agreement with a mutual commitment to collaborate in avoiding confusion in the marketplace. This agreement should be given the substantial and great weight as required by the Federal Circuit.
> (Brief, p. 4; 4 TTABVUE 5)

Applicant goes on to review the agreement in detail, section by section.

The Examining Attorney likewise reviews the agreement in detail and variously finds its pertinent terms "inaccurate … irrelevant … or legally insignificant." (Brief, p. 10; 6 TTABVUE 11). Specifically, he disputes the accuracy of the claim that BLONDE will be displayed equally or more prominently than TIME TRAVELER, because the marks both are in standard character form; the relevance of the use of house marks; and the legal significance of a geographical restriction on Applicant's territory of use (but not on the registration) because the parties agree that Registrant will be free to use its mark in Applicant's territory.

The Examining Attorney, in contending that the consent agreement does not tip the scales in favor of Applicant, relies on *In re Mastic Inc.*, 829 F.2d 1114, 4 USPQ2d 1292 (Fed. Cir. 1987), paying particular attention to the following language:

> [T]he *DuPont* case does not make it a "given" that experienced businessmen, in all cases, make an agreement countenancing each other's concurrent use of the same or similar marks only in recognition of no likelihood of confusion of the public. One must look at all of the surrounding circumstances, as in *DuPont*, to determine if the consent reflects the reality of no likelihood of confusion in the marketplace, or if the parties struck a bargain that may be beneficial to their own interests, regardless of confusion of the public. For example, the parties may prefer the simplicity of a consent to the encumbrances of a valid trademark license. However, if the goods of the parties are likely to be attributed to the same source because of the use of the same or a similar mark, a license (not merely a consent) is necessary to cure the conflict. *See* 1 J. McCarthy, *Trademarks and Unfair Competition* § 18:25, at 866 (2d ed. 1984).

> As *DuPont* holds, a consent is simply evidence which enters into the likelihood of confusion determination and may or may not tip the scales in favor of registrability, depending upon the entirety of the evidence. 476 F.2d at 1362-63, 177 USPQ at 567-69; *see* 1 J. Gilson, *Trademark Protection and Practice* §3.04[3], at 3-64 (1987). If the evidence of record establishes facts supporting an applicant's argument that the two uses can exist without confusion of the public, even a "naked" consent to registration is significant additional evidence in support of the applicant's position. If, in addition, the consent is "clothed" with the parties' agreement to undertake specific arrangements to avoid confusion of the public, as in *DuPont*, the parties' assessment of no likelihood of confusion is entitled to greater weight, not because of the consent itself, but because such arrangements are

> additional factors which enter into the likelihood of confusion determination.

*Id.* at 1294-95.

The Board, in *In re Wacker Neuson SE*, 97 USPQ2d 1408, 1411-12 (TTAB 2010), reviewed the role of consent agreements in the likelihood of confusion analysis. It reviewed the statements of the CCPA in *du Pont*,[7] and the Federal Circuit in *N.A.D.*,[8] *Bongrain*,[9] and *Four Seasons*,[10] showing that the Board is well aware of the views stated in these cases. Notwithstanding these pronouncements on the importance of consent agreements, the *Mastic* case teaches that there is no *per se* rule that a consent, whatever its terms, will always tip the balance to finding no likelihood of confusion, and it therefore follows that the content of each agreement must be examined. Few may be found lacking, but it is not a foregone conclusion that all will be determinative.

We now turn to examine the specifics of the consent agreement. Therein, Applicant and Registrant state that they "wish to avoid any conflict with one another and consent to co-exist" under certain terms and conditions. Further, the parties "agree to cooperate in good faith to resolve such actual confusion and to develop measures sufficient to avoid a likelihood of confusion." The other relevant provisions of the agreement are set forth below.

---

[7] *In re E. I. du Pont de Nemours & Co.*, 177 USPQ at 568.
[8] *In re N.A.D. Inc.*, 754 F.2d 996, 224 USPQ 969 (Fed. Cir. 1985).
[9] *Bongrain Int'l (Am.) Corp. v. Delice De France, Inc.*, 811 F.2d 1479, 1 USPQ2d 1775 (Fed. Cir. 1987).
[10] *In re Four Seasons Hotels Ltd.*, 987 F.2d 1565, 26 USPQ2d 1071 (Fed. Cir. 1993).

1. **Restrictions on Use.** A&S will not use TIME TRAVELER other than in connection with an accompanying house mark, currently THE TRAVELER BEER CO. Bay State will not use TIME TRAVELER BLONDE other than in connection with its own house mark, currently BAY STATE BREWING. Bay State will not use TIME TRAVELER or the word TRAVELER other than as part of the composite mark TIME TRAVELER BLONDE. When referencing TIME TRAVELER BLONDE, Bay State will use the term BLONDE in a manner that is equally as or more prominent than the terms TIME and TRAVELER. For the purposes of this Agreement, "use" includes production, sales at any tier of the three-tier system, distribution, marketing activities, and/or licensing. Notwithstanding the forgoing, Bay State reserves the right to change the name of TIME TRAVELER BLONDE to TIME TRAVELER MAIBOCK, provided that Bay State complies with all provisions of this Agreement, including the restrictions on use outlined in this section. In that event, this section should be read to replace any reference of BLONDE to MAIBOCK. For the avoidance of doubt, Bay State will not use TIME TRAVELER BLONDE and TIME TRAVELER MAIBOCK simultaneously on separate products.

2. **Trade Dress.** A&S will not use trade dress in its packaging, labeling, and/or marketing of TIME TRAVELER that is confusingly similar to the labeling, packaging, marketing materials, or other imagery used by Bay State in connection with its sales and marketing of TIME TRAVELER BLONDE, current examples of which are attached hereto as Exhibit A. Bay State will not use trade dress in its packaging, labeling, and/or marketing of TIME TRAVELER BLONDE that is confusingly similar to the labeling, packaging, marketing materials, or other imagery used by A&S in connection with its sales and marketing of TIME TRAVELER, current examples of which are attached hereto as Exhibit B.

3. **Geographical Limitation.** Bay State will not use TIME TRAVELER BLONDE outside of New England and the State of New York.

4. **Trademark Applications.** A&S will take no action to interfere with Bay State's trademark application for TIME TRAVELER BLONDE, provided that Bay State complies with the terms of this Agreement. Bay State will take no action to interfere with A&S's trademark application for TIME TRAVELER, and/or any existing or future trademark application by A&S using the word TRAVELER, provided that A&S complies with the terms of this Agreement. Upon request, the parties agree to execute a consent form, in a format identical or substantially similar to the form attached hereto as Exhibit C, to evidence this consent and to be filed with the USPTO. The parties agree to cooperate in executing any further documentation required by the USPTO to effectuate the intent and terms of this Agreement.

5. **Likelihood of Confusion.** The parties hereby acknowledge that they believe that there would not be a likelihood of confusion between the TIME TRAVELER mark and the TIME TRAVELER BLONDE mark if the parties comply with the terms of this Agreement. Should actual consumer confusion between the parties' products occur in the future, however, the parties agree to cooperate in good faith to resolve such actual confusion and to develop measures sufficient to avoid a likelihood of confusion.

6. **Ownership of Trademarks.** By this Agreement, A&S acquires no rights from Bay State with respect to the TIME TRAVELER BLONDE trademark other than the consent granted herein. Bay State retains all rights to the TIME TRAVELER BLONDE mark. Similarly, Bay State acquires no rights from A&S with respect to the TIME TRAVELER trademark other than the consent granted herein. A&S retains all rights to the TIME TRAVELER mark. Neither party will in any way attempt to associate itself with the other party or trade on the other party's good will.





Applicant is located in Massachusetts; Registrant is located in Vermont. The "Geographical Limitation" provision in the agreement provides that Applicant will not use its applied-for mark "outside of New England and the State of New York," while Registrant's use is not geographically limited. We find that in this regard the agreement creates two problems.

First, the parties have agreed to allow use of their respective marks in the same territories, because Registrant will be free to use its mark in the entirety of Applicant's territory. Here, the reality is that even as Applicant is bound by its agreement with Registrant, both marks will be used in overlapping geographical areas, namely New England and New York.

Section 2(d) provides that an applicant may request issuance of a registration based on rights acquired by concurrent use of its mark with the owner of a registration for a conflicting mark. *See* TMEP § 1207.04. Here, Applicant is not seeking a concurrent use registration (with a corresponding geographical restriction in Registrant's registration), but rather a nationwide registration. Nor is Applicant seeking a geographically restricted registration as part of the consideration provided to Registrant for entering into a consent agreement. In *Holmes Oil Co. v. Myers Cruizers of Mena Inc.,* the parties sought only to geographically restrict applicant's proposed registration, leaving registrant's registration nationwide in scope. The Board found that applicant agreed to a geographical restriction to the registration it sought "as part and parcel of the consent agreement" with registrant, "not because a geographic restriction is necessary … "[t]hus, although the case is captioned as a concurrent use proceeding, it is only nominally one as the parties' agreement provides that they will operate in overlapping territories." (footnote omitted). 101 USPQ2d at 1149. Because an applicant's right to a geographically restricted registration may only be considered in the context of a concurrent use proceeding, Trademark Rule 2.99(h), the Board considered the parties' agreement

14

as such, with the caveat that, in all other respects, the agreement was a traditional consent agreement. *Id.* By contrast, in this case, Applicant is not seeking a geographically restricted registration and, thus, resort to a concurrent use proceeding is not necessary.

Second, the registration that Applicant would obtain would not reflect the use it has voluntarily restricted itself to. The problem, insofar as registration is concerned, is that the geographical restrictions set forth in the consent agreement are not reflected in the application, and would not be reflected in any resulting registration. The trademark register should reflect, within the constraints of the Trademark Act, the realities of the marketplace. And, more to the point, although Applicant's use, by the terms of the agreement, is limited to New England and New York, a nationwide registration issued to Applicant would give Applicant presumptive nationwide exclusive rights. Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b). *See Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390, 393 (Fed. Cir. 1983). We recognize that a mark shown in an unrestricted registration may actually be used in a smaller territory than that which it can be used. However, when marks are being searched and cleared, there is a presumption by searchers and attorneys afforded to an unrestricted registration that Applicant's registration would not and should not be entitled to. Given that a significant

purpose of the register is to provide the public with notice of the extent of actual or presumptive trademark rights, Applicant's registration would be misleading.[11]

In the absence of geographical restrictions, the effectiveness of the other provisions in the agreement is further diminished. The provision captioned "Restrictions on Use" provides that Applicant and Registrant must use their respective house marks in connection with the marks at issue.[12] With respect to the "Trade Dress" provision, Applicant and Registrant agree to refrain from using trade dress (packaging, labeling, and/or marketing) that is confusingly similar.[13]

We find, however, that the addition of house marks to these virtually identical marks used on identical goods does not necessarily mean that purchasers are not likely to be confused. In general, use of a house mark does not obviate confusion. *See In re Mighty Leaf Tea,* 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed. Cir. 2010);

---

[11] In this connection we see harm to the registration system of searching and clearing marks when the register includes marks that appear to be in direct conflict with each other and yet are on the register at the same time.

[12] This provision also provides that Applicant reserves the right to change the mark from TIME TRAVELER BLONDE to TIME TRAVELER MAIBOCK. This portion of the provision underscores the lack of significance of BLONDE in the mark Applicant seeks to register (*see* discussion, *supra*); that is, Applicant is prepared to jettison that term in favor of another highly descriptive or generic term. Thus, Applicant clearly is relying on TIME TRAVELER as its source identifier.

[13] The agreement also is sorely lacking in business information as to why Applicant and Registrant believe that confusion between their marks is not likely to occur under the particular circumstances of their contemporaneous use. For example, consent agreements often refer to differences between the goods, trade channels and classes of purchasers; the sophistication of purchasers; and dissimilar methods of advertising and promotion. The agreement is silent on all of these points. Lest we be accused of knowing more about the beer business than Applicant and Registrant do, we are not in a position to infer business information that is not specifically expressed in the agreement. *Cf. Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank*, 842 F.2d 1270, 6 USPQ2d 1305, 1308 (Fed. Cir. 1988).

*General Mills Inc. v. Fage Dairy Processing Industry SA,* 100 USPQ 1584, 1602 (TTAB 2011); *In re Fiesta Palms LLC,* 85 USPQ2d 1360 (TTAB 2007).

Further, despite the differences in trade dress illustrated by the labels made of record and which Applicant contends show limitations on rights, Applicant and Registrant actually are requesting more protection through respective nationwide registrations for standard character marks, which marks therefore could be displayed in the same font and size. *See In re Viterra Inc.,* 101 USPQ2d at 1910 (a registered mark in standard character form is not limited to any particular depiction of the mark, but rather may be depicted in any font style, size, or color). The terms of the agreement only require each party to <u>not use the trade dress of the other but do not</u> require the use of particular trade dress by either party. Thus, if each used minimal trade dress and smaller font displays of the house marks, then the essence of the agreement would be met, but would not aid in the avoidance of confusion. Applicant essentially is asking the Board to make a likelihood of confusion determination based upon its mark (with use of its house mark and trade dress as shown in the examples) that not only is not being registered, but is not even in use yet as reflected by its Section 1(b) application, and which Applicant will not be required to use. That is to say, Applicant desires a decision based on its mark, not as applied for, but rather as promised. These promises as to trade dress and house mark usage represent another deviation from the parameters of the application and registration, and thus would result in a failure of the public notice function of registrations. Although we have considered the agreement's provisions

17

regarding the use of different house marks and trade dress, we remain convinced that there exists a likelihood of confusion because the circumstances bind us to consider the contemporaneous use of virtually identical marks on identical goods that are subject to impulse purchase by ordinary consumers in the same geographical area.[14]

We would be remiss if we did not specifically discuss the Federal Circuit's decision in *In re Four Seasons Hotels Ltd.*, which is distinguishable from this one. In *Four Seasons*, the Court found no likelihood of confusion between the marks FOUR SEASONS BILTMORE for "resort innkeeping services" and THE BILTMORE LOS ANGELES for "hotel services":

> Admittedly, the services performed by applicant and registrant are similar, but they are not -- as the TTAB would have it -- the same. One is a resort offering outdoor activities and enjoyment at an oceanfront locale, while the other, a traditional hotel is located in the heart of a city. Likewise, there is no doubt that the marks FOUR SEASONS BILTMORE and THE BILTMORE LOS ANGELES share a common element. However, that purchasers will be confused by this commonality is not a necessary conclusion. Where, as in *Nat'l Distillers* , there are recognized differences in the goods as well as in the marks, [footnote omitted] and the cumulative differences "are sufficient to raise a doubt as to likelihood of confusion, mistake or deception of purchasers arising from the common use of the word, . . . agreements between applicant and the owner of the reference registration are of *evidentiary value*." (Emphasis added.)

---

[14] By contrast, in *Holmes Oil Co. v. Myers Cruizers of Mena Inc., supra*, some of the trade dress was incorporated into applicant's mark and the marks and services were different: CRUIZERS A CONVENIENCE MARKETPLACE AND EATERY and design for "retail store services featuring convenience store items and gasoline" versus MYERS CRUIZZERS DRIVE-IN for "restaurant services."

*Four Seasons Hotels*, 26 USPQ2d at 1072, quoting *In re Nat'l Distillers*, 297 F.2d 941, 132 USPQ 271, 273 (CCPA 1962). Here, by contrast, the marks in the application and registration are virtually identical, with the only difference being a highly descriptive or generic designation for a type of beer ("blonde"). Further, the goods are identical. These are, to say the least, important distinctions.

In addition, the Federal Circuit in *Four Seasons* also relied upon the coexistence of the marks for many years:

> The two parties entered into a consent agreement in acknowledgement of their long-standing coexistence. Although Four Seasons assumed management of the hotel in 1987 and applied to register the mark FOUR SEASONS BILTMORE on May 10, 1989, the oceanside resort has been in existence since the late 1920s, known for years as the Santa Barbara Biltmore. Likewise, THE BILTMORE LOS ANGELES has existed since the 1920's, but is, as the name implies, located in downtown Los Angeles, 120 miles south of applicant's resort.

*Id.* In the present case, Applicant has amended the basis of its application to Section 1(b), alleging a *bona fide* intention to use the mark in commerce, so there is at this time no verifiable proof of coexistence, nonetheless longstanding coexistence, without confusion.[15] Further, in *Four Seasons*, the oceanfront resort and the

---

[15] We wish to make another point based on the fact that the present application alleges an intention to use the mark. As set forth above, the Federal Circuit, in *Four Seasons*, stated the following: "[T]he PTO's role is to protect owners of trademarks by allowing them to register their marks. Denial of registration does not deny the owner the right to use the mark, and thus, will not serve to protect the public from confusion." *Id.* at 1072. The intent-to-use application filing system was adopted to allow applicants to seek clearance of a mark before making an investment in use and marketing. Thus, when the system devised by Congress is used as intended, marks not cleared for registration may never be used and the public may actually be shielded from confusion. That is to say, the mere fact that anyone can adopt and use a mark that is likely to cause confusion with a prior mark, until they are

downtown hotel operated in distinct geographical markets, separated by 120 miles, whereas here the identical goods would be sold in an overlapping geographical area via the same trade channels to the same average purchasers. Moreover, in this case the marks will be used on a type of product often called for by name, sight unseen, with no opportunity for any actual labelling differences that may be used to assure consumers they have obtained what they asked for in a bar or restaurant.[16]

In sum, while we unmistakably recognize the Federal Circuit's instruction that consent agreements are frequently entitled to great weight, we find that the specific consent agreement in this case is outweighed by the other relevant likelihood of confusion factors, namely that the marks are virtually identical, and the goods, trade channels and purchasers are identical. Further, the goods are subject to impulse purchase. Notwithstanding the consent agreement, we are persuaded that patrons in New York and New England are likely to be confused as to source upon encountering the marks TIME TRAVELER and TIME TRAVELER BLONDE, even when these marks are used within the constraints set forth in the consent agreement.

We have carefully considered all of the evidence made of record pertaining to the issue of likelihood of confusion, as well as all of the arguments related thereto. We find that consumers are likely to be confused upon encountering the marks

---

stopped in an infringement suit, is inapposite in a situation like the present case involving an intent-to-use application with no use.

[16] In addition, if the products of Applicant and Registrant are served on draft, from a keg, there will be no labels at all available to the consumers. Because the application and registration are not limited to bottled beverages, draft beer served in a glass must also be considered.

TIME TRAVELER BLONDE and TIME TRAVELER, both for "beer," even when used in accordance with the consent agreement. To reiterate, we are fully cognizant of the importance of consent agreements entered into by business people and the significant role that they can play in determining likelihood of confusion issues. For the reasons expressed above, however, we find that the agreement does not comprise the type of agreement that is properly designed to avoid confusion and does not fully contemplate all reasonable circumstances in which the marks may be used by consumers calling for the goods.

**Decision:** The refusal to register is affirmed.